**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CATHRYN HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRAPANANDA SEAFARMS LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Cathryn Harris ("Plaintiff") individually, and on behalf of all others similarly situated (the "Class" or "Classes"),[1] hereby brings this Class Action Complaint against Defendant Trapananda Seafarms LLC ("Defendant") and alleges the following based on personal knowledge as to herself, and as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE SUIT

1. This is a consumer protection class action arising out of Defendant's deceptive and misleading marketing and sale of Mama Bear frozen Atlantic salmon products (collectively, the "**Salmon Products**").[2] Defendant uniformly markets, labels and sells the Salmon Products to consumers as "Sustainably Farm-Raised," which, as detailed herein, is a far cry from the truth.

---

[1] As defined herein, Plaintiff brings class action claims on behalf of the following classes: (1) the Nationwide Class (2) the Multistate Consumer Protection Class and (3) the Illinois Class (referred to collectively as the "Class" or "Classes"). Members of the Classes are referred to as "Class Members."

[2] The "Salmon Products" shall refer to the following Mama Bear frozen Atlantic salmon products and all substantially similar products in all sizes and flavors, (1) Mama Bear Atlantic Salmon Cubes (16 ounce package); (2) Mama Bear Atlantic Salmon Cubes Teriyaki (10 ounce package); 3) Mama Bear Atlantic Salmon Cubes Sweet & Seasoned (10 ounce package) (4) Mama Bear Atlantic Salmon Burgers (5 count package); and (5) Mama Bear Atlantic Salmon Portions (16 ounce and 24 ounce packages).

2. Rather, Defendant's Salmon Products contain industrially farmed salmon whose production inflicts grave harms on pristine marine ecosystems and resulted in the destruction of marine life in Chile and around the world. Further, the Salmon Products' production causes suffering to the farmed fish through the harvesting of wild fish for salmon feed.

3. No reasonable consumer would believe the Salmon Products are "Sustainably Farm-Raised" if they knew the devastating truth about their source and negative impact on marine ecosystems and the environment.

4. A myriad of reasonable consumers across the United States pay more for food products labeled "Sustainably Farm-Raised" because, as Defendant is keenly aware, they care about the health of marine ecosystems and the environment. These consumers, including Plaintiff and Class Members, purchase products labeled as "Sustainably Farm-Raised," such as the Salmon Products at issue, because they believe their production does not cause indiscriminate damage to marine ecosystems or the environment.

5. Defendant sells its Salmon Products through its Mama Bear brand throughout the United States including (1) Mama Bear Atlantic Salmon Cubes sold in 10 and 16 ounce packages and in plain, sweet & seasoned, and teriyaki flavor (collectively "**Salmon Cubes**"); (2) Mama Bear Atlantic Salmon Burgers sold in 5 count packages ("**Salmon Burgers**"); and (3) Mama Bear Atlantic Salmon Portions sold in 16 and 24 ounce packages ("**Salmon Portions**").

6. Defendant employs a uniform deceptive marketing campaign through its Salmon Product packaging in order to gain the trust of reasonable consumers and persuade them to pay a premium for its Salmon Products, which are intentionally marketed and sold as "Sustainably Farm-Raised" ("**Deceptive Salmon Product Marketing**").

7. As part of Defendant's Deceptive Salmon Product Marketing, Defendant affirmatively represents the Salmon Products as "SUSTAINABLY FARM-RAISED," which is uniformly displayed in all capital letters, in fonts that contrast the background of the packages, directly on the front label of all Salmon Products in all sizes ("**Sustainably Farm-Raised Claim**") where it cannot be missed by consumers as shown below on the Salmon Cubes' packaging for example:



[3]

8. Reasonable consumers understand Defendant's Sustainably Farm-Raised Claim to mean that the production of the salmon in the Salmon Products does not negatively impact marine ecosystems or the environment.

---

[3] https://www.jewelosco.com/shop/product-details.970313333.html (last accessed July 27, 2026).

9. Indeed, based on the Sustainably Farm-Raised Claim made directly on the packaging, Plaintiff and Class Members reasonably expect the salmon in the Salmon Products to be produced according to high environmental and animal welfare standards.

10. This uniform affirmative representation on the front label of the Salmon Products is further corroborated by the representation on Defendant's back label that the Salmon Products are "responsibly sourced," reinforced by representations on Defendant's website and social media and the websites of its authorized retailers.

11. Defendant's Deceptive Salmon Product Marketing, including its Sustainably Farm-Raised Claim and omissions, are material to consumers who review the Salmon Products' labels at the point of purchase and reasonably rely on Defendant's Deceptive Salmon Product Marketing, including its Sustainably Farm-Raised Claim and omissions in deciding to purchase and pay a premium for the Salmon Products.

12. As a result of disseminating its Deceptive Salmon Product Marketing over several years, Defendant garnered the trust of reasonable consumers as a reliable producer of Sustainably Farm-Raised salmon products. Accordingly, reasonable consumers trust Defendant to truthfully market its Salmon Products. Relatedly, they expect Defendant to have the proper policies and procedures in place to ensure that the Salmon Products are indeed "Sustainably Farm-Raised" as promised.

13. Despite Defendant's promises about its Salmon Products, the source for the Salmon Products is not sustainable and sadly, can, have and continue to directly harm to marine ecosystems and the environment. Thus, Defendant's Salmon Products are not Sustainably Farm-Raised.

14. The harsh reality is the salmon in Defendant's Salmon Products is grown by the thousands in crowded industrial net pens overwhelmingly located in pristine and fragile marine

ecosystems within legally protected national reserves in Chilean Patagonia, causing a variety of environmental harms, which indisputably defies Defendant's Deceptive Salmon Product Marketing including its Sustainably Farm-Raised Claim.

15. For example, there are multiple tragic reports of marine life, including endangered species such as the sei whale and other fragile species such as the humpback whale, found dead and tangled in the industrial nets used to grow the salmon contained in the Salmon Products, as shown in the images below:





16. These devastating harms to marine wildlife are accompanied by various other negative impacts on ocean ecosystems and the environment caused by the production of salmon contained in Defendant's Salmon Products.

17. Indeed, Defendant's sole supplier grows the salmon for the Salmon Products using the following unsustainable and unresponsible farming methods and practices contrary to Defendant's Deceptive Salmon Product Marketing:

- raising nearly three quarters (74%) of its salmon in legally protected nature reserves;
- chronically violating its environmental permits through overproduction of salmon;
- producing excess nutrient pollution creating oxygen-free dead zones resulting in mass fish mortalities;
- using toxic pharmaceuticals and other substances including florfenicol, oxytetracycline, flumequine, oxolinic acid, hexaflumuron and ortho-phthalaldehyde, all of which flow into the ocean water surrounding marine cages harming marine life;
- allowing the release of fecal matter, dead fish and trash that kills, sickens and injures native marine animals, including endangered megafauna such as the sei whale and Chilean dolphin;
- failing to prevent non-native, carnivorous salmon from escaping its nets introducing new pathogens and diseases to local fish populations;
- crowding the salmon for the Salmon Products into such dense conditions that their welfare suffers due to stress, diseases, parasites and aggression among the fish; and
- sourcing salmon feed from the forage fishing market, which depletes ocean resources.

18. The following visual succinctly captures some of the environmental harms caused by industrial net pen salmon aquaculture used by Defendant's sole salmon supplier in Chile:




19. Nowhere in Defendant's marketing of the Salmon Products does it disclose this material information—the Salmon Products' production negatively impacts marine ecosystems and the environment. Instead, Defendant intentionally conceals and omits this information from consumers in order to protect its bottom line and sell more Salmon Products.

20. As the processor, marketer and distributor of all Salmon Products with exclusive access to information and knowledge regarding the Salmon Products' sources and farming methods and practices, including upon information and belief, supply chain data, permits, incident reports, logbooks, accounts, inspections and reports, Defendant fails to implement the appropriate corporate controls to market and sell the Salmon Products with the Deceptive Salmon Product Marketing. At the same time, reasonable consumers across the United States expect that Defendant maintains the proper company-wide practices in place to follow the explicit promises Defendant makes in its Deceptive Salmon Product Marketing regarding the truth about the source of its Salmon Products.

21. Through its Deceptive Salmon Product Marketing, Defendant induces reasonable consumers, including Plaintiff and Class Members, to become unwitting participants in the very harm to marine ecosystems and the environment that they attempt to avoid. Indeed, Plaintiff and Class Members purchased and paid a premium for Defendant's Salmon Products in reliance on its Deceptive Salmon Product Marketing.

22. Had Plaintiff and Class Members known that Defendant's Salmon Products were not Sustainably Farm-Raised, Plaintiff and Class Members would not have purchased the Salmon Products on the same terms or for the same price or would have paid significantly less for the Salmon Products. As a result, Plaintiff and Class Members were and continue to be injured by Defendant's deceptive business practices.

23. Therefore, Defendant's deceptive, fraudulent, unfair and unlawful conduct caused damage to Plaintiff and Class Members, violated and continue to violate consumer protection laws and subjects Defendant to monetary penalties and equitable and injunctive orders.

24. Plaintiff, on behalf of herself and Class Members, seeks actual damages, costs, reasonable attorneys' fees and all other relief available under law and equity from Defendant, including punitive damages for its continuous appalling and unconscionable misconduct. Plaintiff also seeks class wide injunctive relief including: (i) the implementation of a corrective advertising campaign to alert consumers of the true nature of the Salmon Products; and (ii) sourcing the Salmon Products from sustainable sources as advertised.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because the proposed Class has more than 100 members, Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $5,000,000.00, exclusive of interests and costs.

26. The Court has personal jurisdiction over Defendant because it conducts and transacts substantial business in Illinois. Defendant intentionally and purposefully marketed, promoted, distributed and sold the Salmon Products at issue in Illinois, rendering exercise of jurisdiction by Illinois courts permissible.

27. Venue is proper in Illinois under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this District, and because Defendant operates and conducts business in this District on a regular and daily basis.

## PARTIES

### I. Plaintiff Cathryn Harris

28. Plaintiff Cathryn Harris is a resident and citizen of Illinois and at all relevant times to this action resided in Lansing, Illinois.

29. Plaintiff purchased all of Defendant's substantially similar Salmon Products including the Salmon Burgers, Salmon Cubes and Salmon Portions regularly since Defendant launched the Mama Bear product line from Jewel-Osco stores located in Munster, Illinois and in Homewood, Illinois. Most recently, in early May 2026, Plaintiff purchased Defendant's Salmon Portions in a 16-ounce package for approximately $20.99 from Jewel-Osco located in Munster, Illinois.

30. Prior to Plaintiff's purchases, she reviewed Defendant's Deceptive Salmon Product Marketing on each of the Salmon Products' packaging including the front and the back label and specifically reviewed the Sustainably Farm-Raised promises.

31. On the packaging for each of Defendant's Salmon Products, Defendant failed to disclose clearly and conspicuously the material fact that the Salmon Products contain industrially farmed salmon whose production negatively impacts marine ecosystems and the environment.

32. Based on this Deceptive Salmon Product Marketing, Plaintiff reasonably believed the Salmon Products were Sustainably Farm-Raised and thus, were farmed using methods and practices that did not negatively impact marine ecosystems and the environment. She reasonably expected her Salmon Products, which were specifically labeled as "Sustainably Farm-Raised," to be produced according to high environmental and animal welfare standards. Furthermore, she reasonably expected Defendant to have the proper company-wide practices in place to follow these explicit promises about the Salmon Products. She certainly did not reasonably expect the production of the salmon in her Salmon Products to negatively impact marine ecosystems and the environment.

33. Further, in reliance on Defendant's uniform Deceptive Salmon Product Marketing, including its Sustainably Farm-Raised Claim and material omissions regarding the true nature of

the source of her Salmon Products, Plaintiff purchased the Salmon Products and paid a premium price for them.

34. Had she known the truth, Plaintiff would not have purchased the Salmon Products on the same terms or for the same price or would have paid significantly less for the Salmon Products. Plaintiff would only consider purchasing Mama Bear Salmon Products in the future if Defendant were to source its Salmon Products with production methods that do not negatively impact marine ecosystems and the environment—in a manner consistent with its advertising.

## II. **Defendant Trapananda Seafarms, LLC**

35. Trapananda Seafarms, LLC is a Florida limited liability company headquartered in Miami, Florida with a principal place of business at 1 SE 3rd Avenue, Suite 1620, Miami, Florida 33131.

36. Defendant Trapananda is the vertically integrated U.S. sales office of Chilean salmon producing company, Australis Seafoods S.A. ("Australis"). Defendant Trapananda is "the sole commercial office for Australis to all North American markets."[4] Defendant Trapananda's global brand is Southring and its consumer brands include both Mama Bear and Cosecha Del Mar.[5]

37. Defendant processes, markets and sells its Salmon Products through its Mama Bear brand to consumers nationwide and in the State of Illinois. Further, Defendant disseminates its Deceptive Salmon Product Marketing on all its Salmon Products and marketing channels nationwide and in the State of Illinois.

[4] *Trapananda Seafarms*, LINKEDIN, https://www.linkedin.com/company/trapananda-seafarms/about/ (last visited July 21, 2026).

[5] *Southring*, AUSTRALIS SEAFOODS, https://www.australis-seafoods.com/en/brands-and-products/ (last visited July 21, 2026).

## FACTUAL BACKGROUND

### I. Consumer Demand for Sustainably Farm-Raised and Responsibly Sourced Seafood

38. As Defendant is well aware, an ever-growing population of consumers in the United States believes it is important that the seafood industry, including farmed salmon sellers such as Defendant, source their seafood products—whether wild or farmed—in ways that do not negatively impact marine ecosystems and the environment.

39. Consequently, these consumers base their purchasing decisions on their perceptions of sustainable farming and fishing practices including the impact of fish farming on marine ecosystems and the environment. Indeed, reasonable consumers, including Plaintiff and Class Members, demand and will pay a premium for seafood products, including salmon, they believe are farmed or fished sustainably and responsibly based on representations such as those included in Defendant's Deceptive Salmon Product Marketing.

40. This is borne out by market research. Survey data consistently shows strong consumer concern for marine ecosystems and the environment and a preference for sustainable seafood. For example, a survey by Cargill found 88% of Americans (and 93% of millennials) are willing to pay more for sustainable and responsibly sourced seafood.[6] Another study found consumers are willing to pay 14% more on average for seafood that is sustainably produced or for seafood "produced according to higher animal welfare standards."[7]

---

[6] *Survey says: Americans will splurge on sustainable seafood*, LQRA (Sept. 11, 2017), https://www.lrqa.com/en/latest-news/survey-says-americans-will-splurge-on-sustainable-seafood/ (last visited July 27, 2026).

[7] Katrin Zander et al., *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe*, 30 J. INT'L FOOD & AGRIBUSINESS MARKETING 251, 262 (Dec. 22, 2017), https://www.researchgate.net/publication/322017984_Consumers'_Willingness_to_Pay_for_Sustainable_Seafood_Made_in_Europe (last visited July 27, 2026).

41. Consumers want and expect "sustainable" food to be produced with higher environmental and animal welfare standards. One study, for example, showed large margins of North American consumers associate the term "sustainable" with environment and atmosphere preservation (73%) and animal welfare (69%).[8]

42. Another study found consumers who were generally concerned with sustainability had strong associations between sustainability terms and animal welfare, labor rights and environmental welfare. The association was so strong, the study concluded that companies are able to convey all these attributes with a single, powerful claim—"sustainable."[9]

43. This holds true for seafood, in particular. As one study noted, researchers tested consumers' preference for "sustainably produced" seafood because that term "can be taken as umbrella term for all the other issues or inclined attributes asked for and, thus, might be preferred by consumers over isolated sustainability issues."[10] Consumers in this same study ranked "minimal use of hormones and drugs," "helping to protect endangered species," "no pollution to the environment" and "respect to fish welfare" as the four most essential elements of sustainable aquaculture.[11]

[8] Krystle Morrison, *How Do Consumers Really Feel About Sustainability?*, FOOD INDUSTRY EXECUTIVE (Jan. 25, 2022), https://foodindustryexecutive.com/2022/01/how-do-consumers-really-feel-about-sustainability/; *Sustainability in motion*, KERRY, 8 (2021), https://www.kerry.com/sustainability/Sustainability-in-Motion.pdf (last visited July 27, 2026).

[9] Muriel C.D. Verain et al., *Sustainable Food Choice Motives: The development and cross-country validation of the Sustainable Food Choice Questionnaire (SUS-FCQ)*, 93 FOOD QUALITY AND PREFERENCE 104267, 4–8 (Oct. 2021), https://www.researchgate.net/publication/351012834_Sustainable_food_choice_motives_The_development_and_cross-country_validation_of_the_Sustainable_Food_Choice_Questionnaire_SUS-FCQ (last visited July 27, 2026).

[10] Zander et al., *supra* note 7, at 262.

[11] *Id.* at 259.

44. Similarly, consumers expect "responsibly sourced" products to prioritize environmental sustainability. Indeed, one study suggested companies wishing to boost consumer trust for their brand evaluate potential suppliers' "environmental risk," because, the study found, consumers who learned of suppliers' environmentally destructive practices no longer believed the product to be responsibly sourced.[12]

45. Consumers increasingly demand "responsibly sourced" products. In one 2020 survey, 69% of consumers reported altering or considering altering their purchasing towards environmentally and socially responsible brands, up from 48% in 2017.[13]

46. Likewise, consumers respond negatively to irresponsible sourcing. When companies have negative press about irresponsible sourcing or production of food, consumers are less likely to purchase their products.[14] In one study, consumers' willingness to purchase decreased even more significantly if they learned the company knowingly or deliberately sourced from environmentally harmful producers.[15]

47. In marketing literature, sustainability and responsible sourcing are known as "credence attributes," meaning they're qualities consumers cannot easily verify at the point of sale

---

[12] Prabhjot S. Mukandwal et al., *Consumer reactions to environmentally irresponsible sourcing practices: An intentionality and motive perspective*, 60(3) J. OF SUPPLY CHAIN MGMT., 39, 48 (2024), https://doi.org/10.1111/jscm.12320 (last visited July 27, 2026).

[13] *Healthy & Sustainable Living: A Global Consumer Insights Project*, GLOBESCAN, 7 (Oct. 2020), https://globescan.com/wp-content/uploads/2020/10/GlobeScan_Healthy_and_Sustainable_Living_Highlights_Report_2020.pdf. (last visited July 27, 2026).

[14] Claire Veit et al., *The Impact of Sustainable Sourcing on Customer Perceptions: Association by Guilt from Scandals in Local vs. Offshore Sourcing Countries*, MDPI SUSTAINABILITY, 8–12 (2018), https://doi.org/10.3390/su10072519. (last visited July 27, 2026).

[15] Mukandwal et al., *supra* note 12, at 48.

or even after purchase.[16] Because consumers lack the information necessary to verify whether sustainability and responsible sourcing claims are true, when making purchasing decisions, they must rely on seafood companies like Defendant to tell the truth and not advertise their products in a misleading and deceptive manner.

48. This makes the truthfulness of sustainability marketing critical. As a former Federal Trade Commission Chair explained, when companies don't "tell the truth, . . . it distorts the market for environmentally friendly products. It puts honest companies, who bear the costs of green business practices, at a competitive disadvantage. And it harms consumers who want to make conscientious decisions about what products to buy and what businesses to support."[17]

49. As the sole U.S. distributor for a large salmon farming corporation, Defendant is keenly aware that (1) consumers prefer sustainably and responsibly produced seafood products, (2) providing such products is a business imperative and (3) customers rely on and expect Defendant to ensure the sustainability of the Salmon Products it sells. Indeed, Defendant bases its marketing decisions upon such knowledge, as evidenced by the Deceptive Salmon Product Marketing, in order to capitalize on consumers' demand for Sustainably Farm-Raised salmon and maximize profits.

---

[16] Schrobback et al., *Food Credence Attributes: A Conceptual Framework of Supply Chain Stakeholders, Their Motives, and Mechanisms to Address Information Asymmetry*, 12 MDPI FOODS 538 (Jan. 2023), https://www.researchgate.net/publication/367444592_Food_Credence_Attributes_A_Conceptual_Framework_of_Supply_Chain_Stakeholders_Their_Motives_and_Mechanisms_to_Address_Information_Asymmetry. (last visited July 27, 2026).

[17] *Statement of Chair Lina M. Khan Regarding the Regulatory Review of the Guides For the Use of Environmental Marketing Claims*, FEDERAL TRADE COMMISSION (Dec. 14, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/statement_of_chair_lina_m._khan_re_green_guides_-_final.pdf. (last visited July 27, 2026).

## II. Defendant Capitalizes on Consumer Demand for Sustainably Farm-Raised Products

### A. The Mama Bear Brand Is Designed to Deceive Consumers

50. Defendant is a major player in the seafood industry; processing, distributing and selling its Salmon Products marketed as "Sustainably Farm-Raised" since approximately 2021.

51. Defendant put a great deal of effort into convincing consumers its Mama Bear branded Salmon Products are a cut above the rest when it comes to their "Sustainably Farm-Raised" quality, for which it knows reasonable consumers will pay a premium.

52. Through highly sophisticated marketing and advertising, Defendant consistently misleads consumers about its Salmon Products by advertising its leading role in the "Sustainably Farm-Raised" market a central component of its brand image. For example, as Defendant's managing director stated in a 2019 interview, "[f]or all of us sustainability and transparency are fundamental everyday missions."[18]

53. Further, according to an August 2021 corporate presentation attached to internal emails obtained by Chilean journalists,[19] as part of its strategy for increasing U.S. sales,[20] Defendant's parent company Australis planned to target "[n]on-price-oriented customers" who

---

[18] *Trapananda Seafarms to fund GSSI*, WORLD FISHING (Jan. 28, 2019) https://www.worldfishing.net/trapananda-seafarms-to-fund-gssi/1102025.article. (last visited July 27, 2026).

[19] *Los correos ocultos de Australis, una de las salmoneras más grandes del mundo: así escondieron la sobreproducción en Chile y buscaron saltarse la regulación Ambiental*, FUNDACIÓN TERRAM (Apr. 30, 2025), https://www.terram.cl/los-correos-ocultos-de-australis-una-de-las-salmoneras-mas-grandes-del-mundo-asi-escondieron-la-sobreproduccion-en-chile-y-buscaron-saltarse-la-regulacion-ambiental/ (last visited July 27, 2026).

[20] *Australis Seafoods Corporate Presentation*, AUSTRALIS SEAFOODS, 23 (Aug. 2021), https://static.theclinic.cl/media/2025/04/29-230122_jwtb_presentacion-joyvio.pdf (last visited July 27, 2026).

"require high quality,"[21] by developing a "Super Premium brand."[22] Indeed, this brand—Mama Bear—would enable the company "to capture extra margin" in the United States,[23] "targeting the final consumer with products, packaging and presentations . . . exhibited at retail & convenience stores for home use."[24]

54. The same corporate presentation proposed to take advantage of consumers' positive perception of salmon as a "Super Premium Sustainable Product[],"[25] observing, "salmon has traditionally been perceived and related to high quality attributes such as being healthy . . . safe, having constant supply, sustainable."[26] The presentation cited "[g]rowing social awareness on [] sustainability" and stated, "[s]almon is sustainable."[27]

55. Australis—Defendant's parent company—planned to develop and launch its own "Super Premium brand" in the United States at the end of 2021 or beginning of 2022, and achieve retail placement.[28] Consequently, Defendant launched its Mama Bear brand in U.S. stores in December 2021.

56. Since successfully launching its Mama Bear brand, Defendant touts the brand's commitment to sustainability and responsible sourcing on its websites. For example, Defendant, through Australis, represents that it is "guided by the sustainability of our operation and values that define us every day" and further, "[c]ommitted to sustainability, the well-being of people and

[21] *Id.* at 24.

[22] *Id.* at 25.

[23] *Id.* at 27.

[24] *Id.* at 25.

[25] *Id.* at 26.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 25.

communities."[29] Even further, Defendant, via its parent company, boasts "[w]e work responsibly respecting our environment."[30]

57. Notably, Defendant's mission, through Australis, is "[t]o be industry leaders in a sustainable way through innovation and constant challenge."[31] Its vision similarly represents "[w]e are passionate about generating a positive impact in people's lives, through the production and delivery of healthy food, challenging our way of doing things, through the sustainable development of communities and our environment."[32]

58. In an effort to convince reasonable consumers to trust the Mama Bear brand to provide Sustainably Farmed-Raised Salmon Products, Defendant, through Australis, proudly represents it has a "Sustainability Strategy" with six pillars, including: Good Environment, Responsible Products, Responsible Operations, Good Government, Good Neighbor and Persons.

59. As part of its Sustainably Strategy, Defendant's parent company Australis specifically explains, "[w]e want to ensure a sustainable integration of our activity, the biodiversity of the oceans and the natural environment of our operation, through responsible waste management, prevention of fish escapes, responsible interaction with marine fauna and monitoring

---

[29] *Australis Seafoods*, https://www.australis-seafoods.com/en/ (last visited July 21, 2026). Defendant directly aligns itself with its parent company and Australis's farming practices by directing visitors to the Mama Bear site, mamabearsalmon.com, to Australis's website, under the link at "WE ARE FARMERS." *See* https://mamabearsalmon.com/.

[30] *Australis Seafoods*, https://www.australis-seafoods.com/en/ (last visited July 21, 2026).

[31] *Our Identity,* AUSTRALIS SEAFOODS, https://www.australis-seafoods.com/en/our-identity/ (last visited July 21, 2026).

[32] *Id.*

and reduction of greenhouse gas emissions … in our operations," as shown in the screenshot below:[33]




60. Australis goes further to claim "[w]e demonstrate our commitment to the highest quality and food safety standards by operating efficiently and responsibly, concerned about our relationship with the environment and surroundings, in addition to continuous improvement in our practices, investment, human capital, and traceability of the product and its inputs throughout the value chain," as shown in the screenshot below:[34]




61. Additionally, Australis represents it is "committed to providing the possible conditions and facilities for a good performance of their work, accompanying their professional and personal growth. In addition, we guarantee healthy work environments through the

---

[33] *Sustainability Strategy Australis 2020 / 2030*, AUSTRALIS SEAFOODS, https://www.australis-seafoods.com/sostenibilidad/english.html (last visited July 21, 2026).

[34] *Id.*

development of strategies that allow us to consolidate a culture of safety and health at work," as shown in the screenshot below:[35]




62. As a result of Defendant's and its parent company's years-long marketing scheme, consumers recognize the Mama Bear's brand as reliable source for farmed salmon including the Salmon Products at issue. Consequently, consumers reasonably rely on and trust Defendant to produce the Sustainably Farm-Raised Salmon Products as advertised.

**B. Defendant's Deceptive Salmon Product Marketing**

63. Defendant carefully crafted a uniform, pervasive Deceptive Salmon Product Marketing campaign, which includes the material Sustainably Farm-Raised Claim on the Salmon Products' packaging made directly to consumers as well as Defendant's material omissions concealing the negative impact of the production of the Salmon Products on marine ecosystems and the environment.

64. Defendant disseminated its Deceptive Salmon Product Marketing to its consumers nationwide in a uniform manner on the Salmon Products' packaging. Defendant further reinforces its packaging claim with the additional misrepresentation, on the back of the package, that the Salmon Products are "responsibly sourced," as well as in similar misrepresentations posted

---

[35] *Id.*

throughout its websites, on social media and through other advertising venues, confirming exactly what it wants consumers to believe from its packaging claims.

65. Defendant sells or has sold the Salmon Products with its Deceptive Salmon Product Marketing to consumers through a variety of major authorized retailers including brick-and-mortar grocery stores such as Albertsons, Jewel Osco, Tom Thumb, ACME, Randalls, Woodman's Markets and Market Basket.

66. **Sustainable Farm-Raised Claim**: As part of Defendant's Deceptive Salmon Product Marketing, Defendant includes and prominently displays the Sustainable Farm-Raised Claim uniformly in all capital letters, in fonts that contrast the background of the packages, directly on the front label of all Salmon Products in all sizes where it cannot be missed by consumers as shown below on each Salmon Product's packaging:



36

***



37

---

[36] https://www.jewelosco.com/shop/product-details.970313333.html (last visited July 27, 2026).

[37] https://mamabearsalmon.com/portions/ (last visited July 27, 2026).

***



[38]

67. Whether buying in store or online, reasonable consumers cannot miss Defendant's Deceptive Salmon Product Marketing including its Sustainably Farm-Raised Claim located directly on the Salmon Products' packaging in making their purchase.

68. Defendant corroborates its "Sustainably Farm-Raised" representation by displaying the claim "responsibly sourced" uniformly on the back label of the Salmon Products, as shown below:

[38] https://www.jewelosco.com/shop/product-details.970313334.html (last visited July 27, 2026).


Family love and care start with a
delicious and healthy
Mama Bear offers high-quality and
responsibly source Atlantic Salmon in a variety
of fun and convenient formats. Our salmon has
Omega-3, Vitamin D, and other nutrients
Take care of your loved ones as the best
Mama Bear
Mama Bear approved recipes
GLUTEN FREE
KOSHER
Nutrition Facts
Calories 184
% Daily Value*
Total Fat 17%
Saturated Fat 13%
Cholesterol 11%
Sodium 3%
Total Carbohydrate 0g 0%
Protein 15g
Best Aquaculture Practices
Processor
Farm
Hatchery
Feed
bapcertification.org
MAMA BEAR
SOUTHRING
BIO ELEMENTS
8 50040 32502 7




69. Defendant's Deceptive Salmon Product Marketing, including its Sustainably Farm-Raised Claim on the Salmon Products' packaging, is further corroborated by representations throughout Defendant's social media.

70. Indeed, Defendant provides purchasers further assurances of sustainability reiterating the Salmon Product packaging representations in its online advertising for Mama Bear Salmon Products. For example, the Mama Bear brand is marked as "Sustainable" on Defendant's Instagram account:[39]

[39] Mama Bear (@mamabear.salmon), INSTAGRAM, https://www.instagram.com/mamabear.salmon/ (last visited July 21, 2026).




71. Further, on May 7, 2025, Mama Bear posted on Instagram that its salmon is "sustainably sourced."[40]




72. In a post just a month later, Defendant went even further, claiming Mama Bear Salmon Products are the "most sustainable protein."[41]

[40] Mama Bear (@mamabear.salmon), INSTAGRAM (May 7, 2025), https://www.instagram.com/p/DJXRvDFN5SQ/ (last visited July 27, 2026).

[41] Mama Bear (@mamabear.salmon), INSTAGRAM (June 26, 2025), https://www.instagram.com/p/DLXbjrlNzOs/ (last visited July 27, 2026).




73. A video Mama Bear published on Instagram another month later similarly claimed its Salmon Products are the "most…sustainable salmon."[42]

74. These Instagram posts boasting of the Salmon Products' sustainability followed a 2022 post in which Defendant similarly emphasized Mama Bear's "sustainable" salmon production, writing, "We are passionate about generating a positive impact on people's lives, through the…sustainable development of communities and our surroundings," and "#sustainability."[43]




---

[42] Mama Bear (@mamabear.salmon), INSTAGRAM (July 3, 2025), https://www.instagram.com/p/DLpwOwHtGWk/ (last visited July 27, 2026) (video claiming Mama Bear is "the **most** delicious, nutritious, and **sustainable salmon** out there" (emphasis added)).

[43] Mama Bear (@mamabear.salmon), INSTAGRAM (Dec. 19, 2022), https://www.instagram.com/p/CmXLV6wsosb/ (last visited July 27, 2026).

***




75. Plaintiff and Class Members reasonably understand Defendant's Deceptive Salmon Product Marketing to mean the Salmon Products do not negatively impact marine ecosystems and the environment. They expect "Sustainably Farm-Raised" salmon to be produced according to high environmental and animal welfare standards. They likewise expect Defendant to have the proper policies and practices in place to make good on these promises.

76. This uniform representation Defendant included as a part of its Deceptive Salmon Product Marketing is material to consumers who review it at the point of purchase and reasonably rely on it in deciding to purchase and pay a premium for the Salmon Products.

## III. Contrary to Defendant's Deceptive Salmon Product Marketing, the Salmon Products Are Not "Sustainably Farm-Raised" Because the Industrial Farming Methods and Practices Use to Grow the Salmon Products Cause Immense Damage to Marine Ecosystems and the Environment

77. Defendant sources its farmed Salmon Products from its sole parent corporation, Australis, a major player in the global business of growing and selling salmon.

78. Contrary to reasonable consumers' expectations, Defendant's Salmon Products marketed as "Sustainably Farm-Raised," are grown by the thousands in crowded industrial net cages in protected natural reserves and with farming methods that threaten, endanger and kill marine wildlife and further negatively impact marine ecosystems and the environment.

79. As Defendant knows, its parent corporation and sole farmed salmon supplier, Australis, engages in the following conduct, which indisputably defies Defendant's Sustainably Farm-Raised Claim:

- raises nearly three quarters (74%) of its salmon in legally protected nature reserves;
- chronically violates its environmental permits through overproduction of salmon;
- produces excess nutrient pollution that can create oxygen-free dead zones in the ocean, resulting in mass fish mortalities;
- uses toxic pharmaceuticals and other substances including florfenicol, oxytetracycline, flumequine, oxolinic acid, hexaflumuron and ortho-phthalaldehyde, all of which can flow into the water surrounding marine cages and harm marine life;
- allows the release of fecal matter, dead fish and trash, which kills, sickens and injures native marine animals, including endangered megafauna such as the sei whale and Chilean dolphin;
- fails to prevent non-native, carnivorous salmon from escaping its nets, which introduces new pathogens and diseases to local fish populations;
- crowds the fish into such dense conditions that their welfare suffers due to stress, diseases, parasites and aggression among the fish; and

- sources salmon feed from the forage fishing market, which depletes ocean resources.

80. Defendant was and continues to be keenly aware, based on its specialized and exclusive knowledge and position, that it sells Salmon Products which are not "Sustainably Farm-Raised" as advertised. However, at no time did Defendant disclose this information to consumers.

**A. The Salmon Products Are Grown in Industrial Net Pens within Pristine and Legally Protected Marine Ecosystems in the Patagonian Fjord**

81. To raise salmon on an industrial scale, Defendant's parent company Australis, like other salmon producers, uses net pens—enclosed, floating cages anchored to the seafloor. Net pens may be circular or rectangular, and can be anywhere from 100 to 160 meters in circumference, or approximately 30 meters by 30 meters for rectangular.[44] Pens of this size can hold tens of thousands of fish each, and may be grouped together in collections of six to thirty pens.[45]

82. Australis operates 96 salmon "farms"—groups of net pens of Atlantic salmon.[46] The farms are also known as "concessions" because the company must apply to the Chilean government for a permit to operate them.[47] The following is a photograph of Australis net pens

[44] *Bigger pens help salmon farm scale new heights*, THE FISH SITE (Dec. 6, 2024), https://thefishsite.com/articles/bigger-pens-help-salmon-farm-scale-new-heights; *Nylon nets for Salmon*, Weihai Huaxing Nets Co., Ltd. https://www.huaxingnets.com/nylon-nets-for-salmon.html (last visited July 23, 2026); Atlantic Canada Fish Farmers Association, *Fish Farm Facts: How they Grow*, https://atlanticfishfarmers.com/fish-farm-facts/how-farmed-salmon-grow/#:~:text=How%20big%20are%20the%20net,are%20the%20nets%20made%20of (last visited July 27, 2026).

[45] *Id.*

[46] Australis Seafoods, *2024 Sustainability Report*, AUSTRALIS SEAFOODS 17 (2025), https://www.australis-seafoods.com/sostenibilidad/pdf/Reporte_2024_eng.pdf (last visited July 27, 2026).

[47] *Id.*; Jane Chambers, *Chile's salmon farms hope for calmer waters*, BBC (May 28, 2025), https://www.bbc.com/news/articles/cd9003z9nzjo (last visited July 27, 2026).

used to grow the salmon contained in the Salmon Products and of which Defendant touts as "Sustainably Farm-Raised."[48]



83. Australis and its subsidiaries operate 71 of their 96 net pen farms within pristine, fragile and legally protected marine ecosystems in national reserves and national parks.[49] Therefore, a staggering 74% of the farms Defendant's salmon supplier operates are located inside legally protected areas.

84. Entirely contrary to Defendant's Deceptive Salmon Product Marketing, the industrial production of salmon for its Salmon Products caused vast ecological devastation to Chilean marine ecosystems in nationally protected environments in the Patagonia fjords of

[48] *Australis Seafoods*, *supra* note 29 (last visited July 22, 2026).

[49] Cristopher Toledo Puga & Daniel Espinoza Iglesias, *Registry of Salmon Farming Concessions Located inside Protected Areas*, FUNDACIÓN TERRAM, 17, 21 (July 2024). Australis Seafood wholly owned subsidiaries include Australis Mar S.A., Acuícola Cordillera Ltda., Salmones Islas del Sur Ltda., Salmones Alpen Ltda., and Procesadora de Alimentos Asf SpA.

southern Chile: Los Lagos, Aysen and Magallanes.[50] Australis operates nearly 100 farms in these regions: 3 in Los Lagos region, 61 in the Aysén region and 32 in Magallanes region.[51]

85. Chile created a "National Reserve" designation to protect its ecosystems with remarkable biodiversity, including ecologically sensitive ocean resources in Las Guaitecas National Reserve in the Aysén region and Kawésqar National Reserve in the Magallanes region.[52]

86. Las Guaitecas National Reserve was established to protect its unique and endemic biodiversity. This reserve is home to wetlands with dense populations of mosses that perform important functions as carbon sinks.[53]

87. Kawésqar National Reserve was established to protect the marine environment adjacent to the Kawésqar National Park, which protects the terrestrial environment, to ensure the continuity of life sources, gene reservoirs, population dynamics and intra- and inter-species relationships, which ultimately preserve biodiversity and ecosystem balance in this region.[54]

88. Notably, the Magallanes region in which Kawésqar sits supports one-third of the world's marine biodiversity, including many protected species such as the blue whale and the

[50] Renato A. Quiñones et al., *Environmental issues in Chilean salmon farming: a Review*, REVIEWS IN AQUACULTURE, 375, 376 (2019), https://doi.org/10.1111/raq.12337 (last visited July 27, 2026).

[51] Australis Seafoods, *supra* note 46, at 17.

[52] Alberto Tacón et al., *Terrestrial Protected Areas in Chilean Patagonia: Characterization, Historical Evolution, and Management*, 19 INTEGRATED SCIENCE 87, 100 (J.C. Castilla et al. eds. 2021, Pontificia Universidad Católica de Chile trans., 2023), https://doi.org/10.1007/978-3-031-39408-9_4 (last visited July 27, 2026).

[53] Claudio Carocca et al., *Incompatibilidad de la salmonicultura con la Reserva Nacional Kawésqar: Antecedentes y contribuciones para el proceso de elaboración del plan de manejo de la Reserva Nacional Kawésqar*, FIMA, GREENPEACE, & AIDA, 27 (Mar. 2021), https://www.fima.cl/wp-content/uploads/2023/05/informe_incompatibilidad.pdf (last visited July 27, 2026).

[54] *Id.* at 17.

endemic Chilean dolphin.[55] Therefore, activities within Kawésqar require the consultation of the native peoples under a binding decree which redesignated the area as a National Reserve.[56]

89. During this designation process, the Chilean government entered a formal agreement with the Kawésqar native people to prohibit certain activities in the Reserve, including intensive industrial aquaculture of exotic species introduced into regional waters.[57]

90. Despite this agreement and these designations, however, the Chilean government permitted salmon farming within the national reserves.[58] Australis seized on this opportunity to grow its Salmon Products in these fragile and pristine ecosystems at the expense of marine life and the environment, and for its own economic benefit.

91. The devastating truth is that Chilean Patagonia, including the national reserves detailed above, is filled with Australis's and others' salmon net pen operations, as shown in the image below ("a" is Los Lagos; "b" is Aysén; "c" is Magallanes).[59]

[55] Maximiliano Bazán & Daniel Espinoza, *95 casos de sobreproducción de salmons en reservas nacionales sin sanción—PARTE 1*, CIPER (May 7, 2024), https://www.ciperchile.cl/2024/05/07/95-casos-de-sobreproduccion-de-salmones-en-reservas-nacionales-sin-sancion-parte-1/ (last visited July 27, 2026); Lucy Meyer and Casey Ann Smith, *Salmon Farms in Patagonia Face Growing Opposition*, N.Y. TIMES (Aug. 13, 2024), https://www.nytimes.com/2024/08/13/science/chile-salmon-farms-patagonia.html (last visited July 27, 2026).

[56] Carocca et al., *supra* note 53, at 43.

[57] *Id.* at 13.

[58] *Id.* at 36-39.

[59] Sandra Bravo et al., *Causal analysis of escapement of farmed salmonids in southern Chile*, 51 LATIN AM. J. AQUATIC RSCH. 363, 366 (2023), https://doi.org/10.3856/vol51-issue3-fulltext-3005 (last visited July 27, 2026).




92. In fact, approximately 30 percent of salmon farming in Chile takes place in particularly ecologically sensitive protected areas, such as national parks and reserves, making the impacts of unsustainable aquaculture practices and environmental violations even more severe.[60]

93. This includes Defendant's one and only salmon supplier, Australis, which operates 70 net pen farms within national reserves and one net pen farm partially inside the Isla Magdalena National Park, or 74% of its production.[61]

94. Even more concerning, Australis is seeking to further expand its operations in the national reserves. An Australis subsidiary recently sued to overturn a law that prohibits the

[60] Puga & Iglesias, *supra* note 49, at 6.

[61] *Id.* at 17, 21.

development of new salmon concessions in national reserves without management plans, which blocked Australis from further salmon farm development within Kawésqar National Reserve and Las Guaitecas National Reserve.[62]

**B. The Industrial Net Pens Used to Grow Defendant's Salmon Products Can and Have Killed Marine Wildlife including Dolphins and Whales**

95. Australis's numerous industrial net pens dotted throughout Chilean Patagonia also threaten vulnerable, native species such as whales and sea lions.

96. On October 28, 2024, Australis discovered a dead humpback whale in one of its farms inside the Kawésqar National Reserve.[63] Australis claimed the whale arrived dead at the farm site.[64] However, security images released a year later indicate that the whale became entangled in nets and that Australis moved the animal's body without authorization before reporting the death to authorities.[65] The initial autopsy reported bruising and injuries consistent with a boat collision; however, authorities note that this report is inconsistent with the new images of the "completely entangled" whale as shown in the image below:[66]

---

[62] Michelle Carrere, *Chile: empresa salmonera va a la Justicia para hacer caer una protección especial en reservas marinas*, MONGABAY (May 21, 2026), https://es.mongabay.com/2026/05/chile-empresa-salmonera-va-justicia-hacer-caer-proteccion-reservas-marinas/ (last visited July 27, 2026).

[63] *La ecocida industria exportadora de salmones y su récord de muertes de ballenas al interior de Parques y Reservas Nacionales en la Patagonia chilena*, ECOCEANOS (Nov. 26, 2024), https://www.ecoceanos.cl/2024/11/la-ecocida-industria-exportadora-de-salmones-y-su-record-de-muertes-de-ballenas-al-interior-de-parques-y-reservas-nacionales-en-la-patagonia-chilena/ (last visited July 27, 2026).

[64] *Id.*

[65] *New Evidence in Dead Whale Case at Kawésqar Reserve: Images Show Entangled Cetacean in Australis Salmon Farm*, EL CIUDADANO (Nov. 16, 2025), https://www.elciudadano.com/en/new-evidence-in-dead-whale-case-at-kawesqar-reserve-images-show-entangled-cetacean-in-australis-salmon-farm/11/16/ (last visited July 27, 2026).

[66] Lucas Ulloa Intveen, *Caso ballena muerta en Reserva Kawésqar: nuevas imágenes revelan a cetáceo enmallado y reactivan causa contra Australis*, LA PRENSA AUSTRAL (Nov. 15, 2025), https://laprensaaustral.cl/2025/11/15/caso-ballena-muerta-en-reserva-kawesqar-nuevas-

**New Evidence in Dead Whale Case at Kawésqar Reserve: Images Show Entangled Cetacean in Australis Salmon Farm**

New images reveal a humpback whale entangled in an Australis Mar farming facility within the Kawésqar National Reserve, contradicting earlier accounts. Prosecutors are investigating evidence handling irregularities, while environmental organizations and the public demand the removal of salmon farms from protected areas, backed by a new environmental crime law.



97. In 2020, Australis reported finding another dead whale in one of its farms inside Las Guaitecas National Reserve.[67] The whale, which authorities determined was a sei whale, an endangered species,[68] died after being completely entangled in Australis's nets and wrapped in a metal chain,[69] as shown in these April 30, 2020 photos:

---

imagenes-revelan-a-cetaceo-enmallado-y-reactivan-causa-contra-australis/ (last visited July 27, 2026); *see also* Maximiliano Bazán et al., *El Caso Australis Seafoods: Crecimiento productivo en base a una política sistemática de incumplimientos ambientales*, FUNDACIÓN TERRAM 17 (March 2025), https://www.terram.cl/descargar/recursos_naturales/salmonicultura/Informe-Caso-Australis-Seafoods-Fundacion-Terram-2025_2.pdf (last visited July 27, 2026).

[67] *Whale found tangled and trapped in rope dies at salmon farm*, SALMONBUSINESS (May 7, 2020), https://www.salmonbusiness.com/whale-found-tangled-and-trapped-in-rope-dies-at-salmon-farm/ (last visited July 27, 2026).

[68] Carocca, *supra* note 53, at 27-28.

[69] *Whale found*, *supra* note 67.







98. Moreover, because salmon net pens are, to sea lions and other marine animals that predate on fish, essentially a giant chum bag suspended on the sea floor, these animals can damage and tear holes in netting, leading the farmed salmon to escape and risking the sea lions and other predating animals becoming ensnared.[70]

[70] Carocca et al., *supra* note 53, at 21.

99. Equipment failures, poor facility maintenance and weather events can also cause farmed fish to escape their pens. Australis's equipment malfunction caused 10,692 salmon to escape in 2024 into waters directly adjacent to Las Guaitecas National Reserve marine boundary.[71]

100. The escaped, carnivorous salmon interrupt the native ecology, preying on native fauna.[72] This reduces food supply for native, sensitive species such as the Chilean dolphin, which is endemic to the region and listed as a vulnerable species.[73] Escaped salmon also spread diseases, transmitting new pathogens and diseases to wild fish that may not have built-up immunity.[74]

101. Consequently, since the introduction of salmon farming into Chilean waters, native species have begun to disappear.[75] These grave dangers to marine wildlife caused by the production of the Salmon Products are entirely contrary to Defendant's Deceptive Salmon Product Marketing and reasonable consumers expectations based on Defendant's unkept promises about its Salmon Products, which are far from "Sustainably Farm-Raised."

---

[71] Australis Seafoods, *supra* note 46, at 74.

[72] Carocca et al., *supra* note 53, at 21; Doris Soto et al., *Environmental risk assessment of non-native salmonid escapes from net pens in the Chilean Patagonia*, REVS. AQUACULTURE 198, 203, https://doi.org/10.1111/raq.12711 (last visited July 27, 2026).

[73] *Id.*; Bazán & Espinoza, *supra* note 55.

[74] Rosamond Naylor et al., *Fugitive Salmon: Assessing the Risks of Escaped Fish from Net-Pen Aquaculture*, 55 BIOSCIENCE 427, 431 (2005), https://doi.org/10.1641/0006-3568(2005)055[0427:FSATRO]2.0.CO (last visited July 27, 2026); Florencia Ortúzar, *The huge environmental costs of salmon farms in South America*, ECOLOGIST (Nov. 1, 2016), https://theecologist.org/2016/nov/01/huge-environmental-costs-salmon-farms-south-america (last visited July 27, 2026).

[75] *Estado Salmonero*, PATAGONIA (2019), at 19:54, 21:10, https://www.patagonia.com/stories/estado-salmonero/video-79855.html (last visited July 27, 2026).

### C. The Salmon in Defendant's Salmon Products Are Unlawfully Overproduced Resulting in Excessive Nutrient Build Up Leading to Dead Zones and Marine Wildlife Mortalities

102. Defendant's sole salmon supplier, Australis, chronically produces more salmon than its facilities' licenses allow, resulting in devastating environmental impacts contrary to Defendant's Deceptive Salmon Product Marketing.[76]

103. During the environmental review process to obtain a salmon concession, regulators determine how much salmon can be produced at the site consistent with environmental safeguards. As the Chilean Superintendent of the Environment explained in 2023, licenses "granted to salmon farming projects establish maximum production limits associated with the environmental load that the sector can receive."[77] When Australis exceeds its production limits, therefore, it causes environmental impacts that were neither considered nor authorized by the Chilean government, in violation of the law.

104. Overproduction exacerbates the already significant environmental harms of producing salmon in enclosed net pens. Specifically, the fish waste and uneaten food create a pile of sludge on the seabed, causing excess nutrient buildup of phosphorus and nitrogen. Even under normal production limits, this accumulation can cause severe damage to marine ecosystems. But when companies like Australis overproduce, the nutrient buildup significantly increases the risk of creating anaerobic (oxygen-free) dead zones.

105. Moreover, the nitrogen content in food and fecal matter release in the form of toxic ammonia, which can decrease growth in vertebrate and invertebrate animals, impede their bodies'

---

[76] Bazán, *supra* note 66, at 2.

[77] Marta Negrete, *Possible sanctions for overproduction to Chilean salmon companies Nova Austral and Multi X*, WEAREAQUACULTURE (Feb. 28, 2023), https://weareaquaculture.com/news/33318 (last visited July 27, 2026).

ability to regulate water and salt levels and increase their vulnerability to pathogens.[78] Effects of ammonia on invertebrates, including shellfish and bivalves, are particularly acute: it can inhibit molting, cause deformities and weaken how their bodies process energy and fight off disease.[79]

106. These impacts are especially concerning in protected areas, such as the national reserves in which Australis operates the vast majority of its salmon farms.[80] Yet, in these sensitive environments, Australis has, for years, crowded millions more fish into its net pens than its environmental permits allow.

107. According to Chilean civil society organization Fundación Terram, between 2015 and 2023, Australis overproduced in 92 production periods (of 18 months)[81] on 46 farms.[82] In that time, the company produced 135,972 tons of salmon more than its permits allowed, or

---

[78] Akeem Babatunde Dauda et al., *Waste Production in Aquaculture: Sources, Components and Managements in Different Culture Systems*, 4 AQUACULTURE AND FISHERIES 81, 82–83 (May 2019), https://doi.org/10.1016/j.aaf.2018.10.002 (last visited July 27, 2026); Tian-Xu Zhang et al., *A review of the toxic effects of ammonia on invertebrates in aquatic environments*, ENV'T POLLUTION 2 (Nov. 1, 2023), https://doi.org/10.1016/j.envpol.2023.122374 (last visited July 27, 2026).

[79] Zhang et al., *supra* note 78, at 2; Nicholas Romano & Chaoshu Zeng, *Toxic Effects of Ammonia, Nitrite, and Nitrate to Decapod Crustaceans: A Review on Factors Influencing their Toxicity, Physiological Consequences, and Coping Mechanisms*, REVS. FISHERIES SCI. 2, 9, 17 (Feb. 13, 2013), http://dx.doi.org/10.1080/10641262.2012.753404 (last visited July 27, 2026).

[80] Negrete, *supra* note 77; Bazán & Espinoza, *supra* note 55.

[81] Atlantic salmon reach maturity over about three years. The salmon start life in inland freshwater hatcheries before being moved to the ocean net pens for their final one to two years. *See Salmon Farming Industry Handbook 2025*, MOWI 54–55 (June 2025), https://mowi.com/wp-content/uploads/2025/06/2025-Salmon-Farming-Industry-Handbook.pdf (last visited July 27, 2026). (last visited July 27, 2026). Australis is permitted to keep the salmon in net pens for 18 months. *See e.g.* República de Chile Comisión Regional del Medio Ambiente de la XI Región de Aysén, Modificacion de Proyecto Tecnico en Centro de Cultivo de Salmonidos 110722, XI Región (Apr. 8, 2009), https://infofirma.sea.gob.cl/DocumentosSEA/MostrarDocumento?docId=97/57/61838d75c818ad292269a3f1357f88205d56 (last visited July 27, 2026).

[82] Bazán, *supra* note 66, at 2.

approximately 30 million[83] additional fish.[84] Even worse, 35 of Australis's over-producing farms are located within national reserves.[85]

108. Importantly, approximately 40 percent of Australis's overproduction—55,118 tons of it—occurred during or after 2021, when Defendant launched the Salmon Products sourced from Australis, claiming to be "Sustainably Farm-Raised."[86]

109. Australis's overproduction has paid dividends for the company. Fundación Terram estimates Australis gained an extra $230 to $345 million of profit from its 92 cases of overproduction, or between $97 and $144 million in excess profits since the 2021 Mama Bear brand launch.[87]

110. However, its overproduction has come at a steep cost for the environment surrounding Australis's net pens. One problem is mass die-offs of salmon in the net pens because of inadequate oxygen in the water column. Mass fish die-offs are a common trouble for salmon

[83] Salmon production is always reported in metric tons. While the harvest weight of salmon fluctuates, an average Atlantic salmon at harvest is between 8.5 and 12 pounds. *Salmon Farming Industry Handbook*, *supra* note 81, at 54; Lucía Barreiro ed., *Chile's salmon industry looks to restart growth, with coho leading the way*, AQUAFEED (Mar. 12, 2026), https://www.aquafeed.com/newsroom/editors-picks/chiles-salmon-industry-looks-to-restart-growth-with-coho-leading-the-way/ (last visited July 27, 2026). A metric ton of salmon is between 185 and 260 fish, meaning Australis overproduced 25 to 36 million fish.

[84] Bazán, *supra* note 66, at 2.

[85] *Id.*

[86] *Id.*

[87] *See id.* at 16–20.

net pen operations.[88] They lead to enormous volumes of dead fish that can foul surrounding waters and coastlines and further exacerbate the nutrient overload starving the water column of oxygen.[89]

111. Because of its rampant overproduction, Australis's operations have seen mass mortality events.[90] For example, in 2021, while overproducing salmon Australis used 1,065 tons more feed than its permits allowed at a farm located in Las Guaitecas National Reserve.[91] The excess feces and uneaten feed accumulated on the seabed and resulted in inordinate nutrient deposits, creating anaerobic conditions that caused 31,381 salmon to suffocate over an 11-day period.[92]

112. During a 2018 case of overproduction in Kawésqar National Reserve, the resulting anaerobic conditions killed several thousand salmon, producing 15 metric tons of dead fish.[93]

113. Of the 36 cases of overproduction between 2021 and 2023—after Defendant's launch of Mama Bear—twelve caused anaerobic conditions, and nine of these occurred within national reserves.[94] The Chilean government initiated sanctions against Australis for all 36 of these

---

[88] *See, e.g.*, Alex Kennedy, *2 more mass salmon die-offs reported off south coast of Newfoundland*, CBC (July 31, 2025), https://www.cbc.ca/news/canada/newfoundland-labrador/salmon-mortality-events-1.7598607 (last visited July 27, 2026).

[89] Gerald G. Singh et al., *Quantitative analysis of mass mortality events in salmon aquaculture shows increasing scale of fish loss events around the world*, NATURE SCI. REP. 2 (2014), https://doi.org/10.1038/s41598-024-54033-9 (last visited July 27, 2026); Bazán & Espinoza, *supra* note 55.

[90] Bazán & Espinoza, *supra* note 55.

[91] *Id.*

[92] *Id.*

[93] Lissandra Souto Cavalli et al., *Salmon mass mortality events and occupational health and safety in Chilean aquaculture*, 16 ALL LIFE 5 (May 3, 2023), https://doi.org/10.1080/26895293.2023.2207772 (last visited July 27, 2026).

[94] Bazán, *supra* note 66, at 2.

overproduction incidents[95] Meanwhile, consumers including Plaintiff and Class Members were duped into believing that Defendant would ensure that its Salmon Products were "Sustainably Farm-Raised" as promised. No reasonable consumers would believe Defendant's Salmon Products are "Sustainably Farm-Raised" if they knew the salmon in their Salmon Products is overproduced leading to devastating ecological harms such as dead zones.

### D. The Use of Pharmaceuticals, Chemicals and Toxic Disinfectants in the Production of Defendant's Salmon Products Contributes to the Growth of Antibiotic-Resistant Bacteria and Causes Injuries to Surrounding Marine Wildlife

114. Beyond the harms stemming from the net cages and overproduction, the farming methods used to produce even a lawful amount of Defendant's Salmon Products, represented as "Sustainably Farm-Raised," drastically endanger the environment and animal welfare through the rampant use of pharmaceuticals, chemicals and toxic disinfectants.

115. Defendant's Salmon Products are sourced from farms that use extremely high levels of antibiotics on their non-native Atlantic salmon. Indeed, Chile does not have any native species of salmon[96] rendering the Atlantic salmon Defendant's supplier raises as "exotic," or non-native, to Chile. As a result, the salmon are highly susceptible to native Chilean bacteria such as Piscirickettsia salmonis, against which the fish have no natural immunity.

116. Consequently, salmon farming corporations in Chile, including Australis, use extremely high levels of antibiotics—more than any other country that farms salmon.[97] In 2024,

---

[95] *Id.*

[96] Elena Basso, *'Those who eat Chilean salmon cannot imagine how much human blood it carries with it'*, THE GUARDIAN (Dec. 2, 2025), https://www.theguardian.com/global-development/2025/dec/02/chile-salmon-farms-fish-industry (last visited July 27, 2026).

[97] *Annual Report: Chilean Salmon Antibiotic Reduction Program*, MONTEREY BAY AQUARIUM SEAFOOD WATCH 7 (2022), https://d1v5k86lqgwnzg.cloudfront.net/assets/pdfs/seafood-

the Chilean industry used over 350 tons of antibiotics, compared to less than one ton in Norway, where Atlantic salmon are a native species.[98]

117. Although Australis boasts reducing its use of antibiotics over the years, it used more antibiotics in 2024 than in any year since 2019. By its own reporting, in 2024 Australis used 206.68g per ton of salmon produced—a total of nearly 22,000 pounds of antibiotics in its salmon production.[99] In comparison, the entire salmon farming industry in Norway—which produces more salmon than any other country—used only 1,630 pounds of antibiotics in 2025.[100]

118. The use of antibiotics is detrimental to marine ecosystems and thus, contrary to reasonable consumer expectations when purchasing the Salmon Products.

119. For example, antibiotics are administered to salmon via their feed, but not all the antibiotics make it into the salmon—or stay there. Antibiotics leach into the environment when uneaten feed and unmetabolized antibiotics in fish feces fall to the ocean floor.[101] Research indicates salmon excrete into the environment 70% to 80% of the antibiotics they consume.[102]

---

watch/assessments/Chilean-salmon-antibiotic-reduction-program-annual-rep-2022.pdf (last visited July 27, 2026).

[98] John Bartlett, *Chile's Indigenous fishermen say the salmon industry threatens their way of life*, NPR (June 8, 2025), https://www.npr.org/2025/06/08/nx-s1-5309752/chile-salmon-farms-indigenous (last visited July 27, 2026); Elias Dahlen, *Antibiotic use in Norwegian aquaculture ticks up, but still stands at fraction of Chile's*, INTRAFISH (Nov. 17, 2025), https://www.intrafish.com/aquaculture/antibiotic-use-in-norwegian-aquaculture-ticks-up-but-still-stands-at-fraction-of-chiles/2-1-1902359 (last visited July 27, 2026).

[99] Australis Seafoods, *supra* note 46, at 58, 62.

[100] Dahlen, *supra* note 98.

[101] Carolina Ramírez, *Microbiota composition and susceptibility to florfenicol and oxytetracycline of bacterial isolates from mussels (*Mytilus *spp.) reared on different years and distance from salmon farms*, 204 ENV'T RSCH. 2 (Mar. 2022), https://doi.org/10.1016/j.envres.2021.112068 (last visited July 27, 2026).

[102] Joy E. M. Watts et al., *The Rising Tide of Antimicrobial Resistance in Aquaculture: Sources, Sinks and Solutions*, MARINE DRUGS 4 (June 1, 2017), https://doi.org/10.3390/md15060158 (last visited July 27, 2026).

120. This is concerning to reasonable consumers who seek to purchase "Sustainably Farm-Raised" salmon because the buildup of antibiotics on ocean floors and pervasive use of antibiotics drives the growth of antibiotic-resistant bacteria.[103] Antimicrobial resistance is a global health crisis,[104] and antibiotic-resistant bacteria and genes have been found in ocean sediments below salmon farms.[105]

121. Because of increased antibiotic resistance, salmon farms in Chile resorted to more and more potent antibiotics. Producers, including Australis,[106] are using the powerful, broad-spectrum antibiotic florfenicol,[107] which is tightly regulated in the U.S.[108] Eventually, bacteria will become resistant to even this, likely necessitating the use of antibiotics reserved for human medicine.[109]

[103] Javiera Ortiz-Severín et al., *Impact of salmon farming in the antibiotic resistance and structure of marine bacterial communities from surface seawater of northern Patagonia area of Chile*, 57 BIOLOGICAL RSCH. 2 (Nov. 10, 2024), https://doi.org/10.1186/s40659-024-00556-4 (last visited July 27, 2026).

[104] Jonathan Lambert, *Antibiotic resistance is rising at an alarming rate*, NPR (Oct. 15, 2025), https://www.npr.org/sections/goats-and-soda/2025/10/15/g-s1-93449/antibiotic-resistance-bacteria (last visited July 27, 2026).

[105] Ortiz-Severin et al., *supra* note 103, at 2.

[106] República de Chile, *supra* note 81.

[107] *Estado Salmonero*, *supra* note 75, at 11:09-12:10.

[108] *See* 21 C.F.R. §§ 558.261, 556.283, 558.4.

[109] *See Estado Salmonero*, *supra* note 75, at 11:45.

122. Chile does not prohibit salmon farms from using antibiotics classified as critical for human health.[110] And Australis is already using one of these: oxytetracycline, a broad-spectrum antibiotic generally reserved for more serious, systemic infections in human medicine.[111]

123. Remarkably, the salmon contained in Defendant's Salmon Products marketed as "Sustainably Farm-Raised" is given flumequine, an antibiotic that had such severe side effects in humans—such as ocular toxicity and spontaneous tendon rupture—that its use in humans has been discontinued and the drug has been entirely removed from the European Union market.[112]

124. Additionally, the overuse of antibiotics in the salmon contained in the Salmon Products harms marine animals because once in the marine environment, antibiotics can be consumed or absorbed by other marine animals.

125. Indeed, researchers found residues of three of the antibiotics Australis uses—flumequine, oxytetracycline and oxolinic acid—in wild fish near Chilean salmon farms.[113] Antibiotic residues in the environment surrounding net pens can alter the protective effects of beneficial bacteria on the skin and in the digestive tracts of wild fish, increasing their vulnerability

---

[110] Ivonne Lozano-Muñoz, *Antimicrobial resistance in Chilean marine-farmed salmon: Improving food safety through One Health*, 12 ONE HEALTH 2 (June 2021), https://doi.org/10.1016/j.onehlt.2021.100219 (last visited July 27, 2026).

[111] República de Chile, *supra* note 81; Juan Cruz Carrizo et al., *Different antibiotic profiles in wild and farmed Chilean salmonids. Which is the main source for antibiotic in fish?*, 800 SCI. TOTAL ENV'T 6 (Dec. 15, 2021), https://doi.org/10.1016/j.scitotenv.2021.149516 (last visited July 27, 2026).

[112] *Quinolone-and fluoroquinolone-containing medicinal products – referral: European Commission final decision*, EUROPEAN MEDICINES AGENCY (Nov. 16, 2018), https://www.ema.europa.eu/en/medicines/human/referrals/quinolone-fluoroquinolone-containing-medicinal-products (last visited July 27, 2026).

[113] República de Chile, *supra* note 81; Carrizo, *supra* note 111, at 4.

to infection.[114] Researchers propose that the antibiotics and chemicals from the salmon industry are causing an increase in skin disorders on Peale's and Chilean dolphins.[115]

126. Moreover, consumption of antibiotic-tainted wild fish or other antibiotic-contaminated food may be detrimental to human health.[116]

127. Industrial net pens like those which contain the salmon for Defendant's Salmon Products also create an ideal environment for the spread of parasites among the caged fish, including sea lice. Lepeophtheirus salmonis, a sea louse that targets salmonids, is a small crustacean that latches onto the salmon's bodies and feeds on their skin and blood.[117]

128. As sea lice feed, they cause painful, open sores like that pictured below. The sores are easily susceptible to infection, which can ultimately kill the salmon.[118]

---

[114] Ryan Nebeker, *The FoodPrint of Farmed Seafood*, FOODPRINT & NORTHWEST ATLANTIC MARINE ALLIANCE 15 (2020), https://foodprint.org/wp-content/uploads/2020/10/2020_09_29_FP_Aquaculture_Report_FINAL-1.pdf (last visited July 27, 2026).

[115] Jessica McKenzie, *The Perils of Farming Salmon in a Warming World*, MOTHER JONES (July 2, 2023), https://www.motherjones.com/environment/2023/07/salmon-fish-farming-aquaculture-environmental-hazards-patagonia-chile/ (last visited July 27, 2026).

[116] Carrizo, *supra* note 111, at 3.

[117] Karen McVeigh, *Sea-lice outbreak on Icelandic salmon farm a 'welfare disaster', footage shows*, THE GUARDIAN (Nov. 3, 2023), https://www.theguardian.com/environment/2023/nov/03/sea-lice-outbreak-icelandic-salmon-farm-welfare-disaster-footage-shows (last visited July 27, 2026).

[118] *Id.*; Kathryn S. Peiman et al., *What are the effects of sea lice on wild and farmed Pacific and Atlantic salmon? A systematic map protocol*, 6 ECOLOGICAL SOLUTIONS & EVIDENCE 3 (2025), https://doi.org/10.1002/2688-8319.70104 (last visited July 27, 2026); Albert Didriksen & Aksel Sterri, *Beneath the surface: The animal welfare crisis in Norwegian fish farming*, LANGSIKI 7 (trans. Jan. 14, 2025), https://cdn.prod.website-files.com/64a1a409bd714bed5921f722/67867a574de237b6aa9c3519_BENEATH%20THE%20SURFACE_%20%20The%20Animal%20Welfare%20Crisis%20in%20%20Norwegian%20Fish%20Farming.pdf (last visited July 27, 2026).



129. Sea lice struggle to find a host in wild salmon, but the overcrowded conditions inside salmon net pens allow these parasites to multiply and thrive.[119] The salmons' suffering is exacerbated by the extremely high stocking density. Having enough space to swim and express natural behaviors is vital for aquatic species like salmon.[120] Yet when salmon are confined to crowded environments like net pens, they must compete for space and resources and have no ability to retreat. The carnivorous salmon can become aggressive and maim each other,[121] even eating each others' eyes.[122]

130. To control sea lice in the salmon grown for the Salmon Products, Australis administers antiparasitic drugs called hexaflumuron and lufenuron via immersion by surrounding

[119] Emily Osterloff, *The problem of sea lice in salmon farms*, NATURAL HISTORY MUSEUM, https://www.nhm.ac.uk/discover/the-problem-of-sea-lice-in-salmon-farms.html (last visited July 23, 2026).

[120] *Key Aquatic Animal Welfare Recommendations for Aquaculture*, AQUATIC ANIMAL ALLIANCE 5, https://aquaticanimalalliance.org/resource-aquaculture/key-aquatic-animal-welfare-recommendations-for-aquaculture (last visited July 23, 2026).

[121] Mark Borthwick, *Welfare Issues in Farmed Atlantic Salmon*, FISH WELFARE INITIATIVE 9 (May 2020), https://files.fwi.fish/Salmon_Welfare_Report.pdf (last visited July 27, 2026).

[122] *Aquaculture: A Sea of Suffering*, ANIMAL OUTLOOK, https://animaloutlook.org/investigations/aquaculture/ (last visited July 23, 2026).

the net pens with tarps and dumping the medicine in the ocean.[123] Hexaflumuron and lufenuron kill the lice by preventing them from forming exoskeletons. However, shrimp and other crustaceans are genetically similar to sea lice, so hexaflumuron and lufenuron are highly toxic to them and other aquatic invertebrates, which cannot survive without exoskeletons.[124]

131. This is concerning to reasonable consumers including Plaintiff and Class Members because when Australis administers hexaflumuron or lufenuron, it can easily leak into the natural environment, as Australis's method relies on a tight seal around the pens with mere tarps.

132. Moreover, even after the tarps are removed, salmon may excrete excess medication into the environment. Any leakage or excretion of hexaflumuron or lufenuron can be devastating to marine animals nearby.

133. Beyond toxic antiparasitic drugs, Defendant's salmon supplier also uses a wide array of chemical disinfectants and biocides in its net pens, including one with the active ingredient ortho-phthalaldehyde,[125] which, according to the World Health Organization (WHO), is "[v]ery

---

[123] *Feeding response in marine copepods as a measure of acute toxicity of four anti-sea lice pesticides*, 101 MARINE ENVIRONMENTAL RESEARCH 145 (Oct. 2014), https://www.sciencedirect.com/science/article/abs/pii/S0141113614001718?__cf_chl_tk=w3HvZfdFDPlK3bW.XVU2LF3tRhwYJqLy4XbxoVSy9xQ-1780933605-1.0.1.1-l6H.xHjJCcwTGNc2QvZ9qNHZEoo4q6Loyhnx3dc3XYU (last visited July 27, 2026).; *Plan Integrado de Plagas*, AUSTRALIS SEAFOODS 8–9, https://www.australis-seafoods.com/certificaciones/plan-integrado-de-plagas/ (last visited July 23, 2026).

[124] Hexaflumuron (General Fact Sheet), NATIONAL PESTICIDE INFORMATION CENTER 3 (2000), https://npic.orst.edu/factsheets/hexgen.pdf (last visited July 27, 2026); *High level efficacy of lufenuron against sea lice (Lepeophtheirus salmonis) linked to rapid impact on moulting processes*, 8 INTERNATIONAL JOURNAL FOR PARASITOLOGY: DRUGS AND DRUG RESISTANCE 174 (Mar. 13, 2018), https://www.sciencedirect.com/science/article/pii/S2211320717301215?via%3Dihub (last visited July 27, 2026).

[125] República de Chile, *supra* note 81; *Trento 20 kg*, DIFEM LABORATORIES, https://difem.cl/producto/trento-20-kg/ (last visited July 23, 2026).

toxic to aquatic life with long lasting effects."[126] While the WHO report "strongly advised" users "not to let the chemical enter into the environment,"[127] when used in Australis's salmon production, such disinfectants and biocides can flow directly into the open ocean.[128]

134. Finally, Australis also uses anti-fouling coatings on net pens, to prevent the growth of unwanted organisms that could impede seawater circulation.[129] These coatings can be copper-based, zinc-based or use other compounds such as tralopyril.[130] Zinc and copper coatings accumulate in the surrounding environment and marine animals.[131] Both zinc and copper are toxic to marine animals, with one study describing copper as "one of the most hazardous metals to aquatic animals."[132] Tralopyril, meanwhile, degrades rapidly, and its derivative substances[133] are

---

[126] ICSC 1784 - ORTHO-PHTHALALDEHYDE.pdf, https://chemicalsafety.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=1784&p_version=2 (last visited July 27, 2026).

[127] *ORTHO-PHTHALALDEHYDE*, INTERNATIONAL LABOUR ORGANIZATION & WORLD HEALTH ORGANIZATION, https://chemicalsafety.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=1784&p_version=2 (last visited July 23, 2026).

[128] Nebeker, *supra* note 114, at 11, 15–16.

[129] República de Chile, *supra* note 81.

[130] *Screening Program 2024*, NORWEGIAN INSTITUTE FOR WATER RESEARCH 5 (Sept. 25, 2025), https://www.miljodirektoratet.no/publikasjoner/2025/oktober-2025/screening-programme-2024/ (last visited July 27, 2026).

[131] *Id.* at 5, 7–8; M. A. Zyadah & T. E. Abdel-Baky, *Toxicity and Bioaccumulation of Copper Zinc and Cadmium in Some Aquatic Organisms*, 64 BULLETIN OF ENVIRONMENTAL CONTAMINATION AND TOXICOLOGY 740 (May 2000), https://link.springer.com/article/10.1007/s001280000066 (last visited July 27, 2026).

[132] Cui et al., *Comprehensive assessment of copper's effect on marine organisms under ocean acidification and warming in the 21st century*, 927 SCIENCE OF THE TOTAL ENVIRONMENT 1 (June 1, 2024), https://www.sciencedirect.com/science/article/abs/pii/S0048969724022885 (last visited July 27, 2026); Zyadah & Abdel-Baky, *supra* note 131, at 742-43.

[133] Research suggests Tralopyril may degrade into trifluoroacetic acid, a toxic "forever chemical" that causes serious health risks including infertility and damage to unborn babies. *PFAS in Pesticides*, MINNESOTA DEPARTMENT OF AGRICULTURE 28 (Feb. 1, 2025), https://www.lrl.mn.gov/docs/2025/mandated/250302.pdf (last visited July 27, 2026); *Screening*

remarkably stable in marine environments, which may have long-term impacts on the surrounding environment.[134]

135. These consequences of the farming methods used to grow the Salmon Products are indisputably contradictory to Defendant's Deceptive Salmon Product Marketing including the Sustainably Farm-Raised Claim made directly on the Salmon Products' packaging.

**E. The Production of Defendant's Salmon Products Causes Dire Environmental Consequences throughout the Entire Supply Chain**

136. The unsustainable production of salmon for Defendant's Salmon Products begins far before the salmon reach the ocean net pens starting with the production of salmon feed and the growing of salmon from eggs.

137. Though farmed fish producers claim farming reduces the environmental strain on wild-caught fish, salmon net pen aquaculture is inextricably tied to wild fishing. Salmon are carnivorous and rely on wild-caught "forage" fish such as sardines whose harvest significantly depletes wild habitats and forage fish species.[135]

---

*Program 2024*, *supra* note 130, at 8-9. The manufacturer published a report claiming tralopyril does not degrade into trifluoroacetic acid. *See* Tony Kempen and Don McKenzie, *How to Reconcile Clean Aquaculture Nets and Fish Welfare with a Clean Environment*, JANSSEN PMP at 15 (February 2024), https://www.janssenpmp.com/sites/default/files/downloadDocuments/EconeaWhitepaper4.pdf (last visited July 31, 2026). However, the manufacturer never publicly released the underlying data of this report nor the data it submitted to the EPA.

[134] Ali Mahmoodi & Xianming Shi, Washington State Department of Ecology, *Toxicological Effects of Antifouling Agents on Non-target Marine Species* 23 (2023), https://apps.ecology.wa.gov/publications/documents/2304066.pdf (last visited July 27, 2026).

[135] Rosamond Naylor & Marshall Burke, *Aquaculture and Ocean Resources: Raising Tigers of the Sea*, 30 Ann. Rev. Env't Res 185, 195-97 (2005), https://doi.org/10.1146/annurev.energy.30.081804.121034 (last visited July 27, 2026) ("If the farming of carnivorous fish continues to grow at its current rate, the demand for fish oil is expected to outstrip supply within a decade.")

138. According to a recent study, it takes 3.6 to 13.7 pounds of wild-caught fish to produce a mere 2.2 pounds of farmed salmon.[136] For comparison, farm-raised tilapia require only 0.2 pound of wild-caught fish for every pound of body weight.[137]

139. To support its salmon industry, Chile is one of the largest importers of foreign fish oil created with forage fish.[138] In 2024, about half (46%) of the forage fish oil that Chile imported, or nearly 40,000 tons, came from China.[139] China's forage fisheries are notorious for their unsustainable and irresponsible practices.[140]

140. Forage fish are highly susceptible to overfishing. In most forage fisheries, catch rates meet or exceed the threshold in which the fish can be sustainably harvested without long-

[136] Kenny Torrella, *Fish farming was supposed to be sustainable. But there's a giant catch.*, VOX (Oct. 24, 2026), https://www.vox.com/future-perfect/379564/fish-farming-sustainable-wild-caught (last visited July 27, 2026). *See also* Marianne Holmer, *Environmental issues of fish farming in offshore waters: perspectives, concerns and research needs*, 1 AQUACULTURE ENV'T INTERACTIONS 57, 61 (2010), https://www.int-res.com/articles/aei2010/1/q001p057.pdf (last visited July 27, 2026).

[137] Patricia Majluf et al., *A review of the global use of fishmeal and fish oil and the Fish In: Fish Out metric* at 8, SCI. ADVANCES (2024), https://doi.org/10.1126/sciadv.adn5650 (last visited July 27, 2026).

[138] Majluf et al., *supra* note 137, at 5.

[139] Data retrieved from *Global Aquatic Trade Statistics*, UNITED NATIONS FOOD AND AGRICULTURE ORGANIZATION (2024), https://www.fao.org/fishery/statistics-query/en?dataset=trade&timeseries=trade_quantity (last visited July 31, 2026) (Query: Reporting Country – Chile; Partner Country – All; Commodity – All, later filtered for oils; Trade Flow – Imports; Year – All; Columns – Year; Rows – Reporting country Name En, Partner Country Name En, Commodity Name En, Trade flow Name En.)

[140] One Senator summarized the Chinese fisheries as "illegal fishing, market manipulation, some of the worst environmental standards on oceans in the world, gray fleets that don't abide by any international treaties, and forced labor, all in one supply chain." *See* Congressional-Executive Committee on China, *Dark Nets, Illicit Labor—Confronting China's IUU Fishing and Seafood Supply Chain*, at 0:54, YOUTUBE (Apr. 16, 2026), https://www.youtube.com/watch?v=S2vZLWtnTbs (last visited July 27, 2026).

term population impacts.[141] Indeed, recent reporting indicates the world's largest salmon feed producers are depleting fish stocks that countries depend on for basic human sustenance. This reporting accused the feed industry of "extract[ing] nutrition" in some of the world's most food-insecure nations, to feed farmed salmon.[142]

141. To the extent that Australis boasts a lower use of forage fish for its salmon production, according to internal corporate documents, it has turned to canola oil,[143] a genetically modified monocrop that comes with its own suite of environmental harms.[144] Moreover, replacing fish oil with canola oil in feed reduces the resulting salmon's long-chain omega-3 fatty acids, a key health target for salmon consumers.[145]

142. The unsustainable and irresponsible farming and sourcing practices continue at the salmon hatchery. Before Australis places mature salmon in the net pens to be fattened for harvest, it hatches and raises them in land-based, freshwater hatcheries and fish farms, through its land-based smolt arm, Australis Agua Dulce S.A.

---

[141] Changing Markets Found. & Compassion in World Farming, *Until the Seas Run Dry* 25 (2019), https://changingmarkets.org/report/until-the-seas-run-dry-how-industrial-aquaculture-plundering-oceans-farmed-fish/ (last visited July 27, 2026); Ellen Pikitch et al., *Little Fish, Big Impact* 4 (2012), https://users.soe.ucsc.edu/~msmangel/Pikitch%20et%20al%202012%20ES.pdf; *Share of fish stocks that are overexploited, 2021*, OUR WORLD IN DATA (last updated May 22, 2026), https://ourworldindata.org/grapher/share-of-fish-stocks-overexploited?time=latest (last visited July 27, 2026).

[142] Feedback et al., *Blue Empire* 4 (2024), https://foodrise.org.uk/wp-content/uploads/2024/02/Feedback-BlueEmpire-Jan24.pdf (last visited July 27, 2026). This study stated, "Each year, around one-fifth of the world's annual marine catch (over 16 million tons in 2020) is used to produce [fish meal and fish oil], the bulk of which goes to producing feed for the aquaculture industry." *Id.* at 7.

[143] *Australis Seafoods Corporate Presentation*, *supra* note 20, at 27.

[144] *Id.* at 19

[145] *Id.* at 26; M. Sprague et al., *Impact of sustainable feeds on omega-3 long-chain fatty acid levels in farmed Atlantic salmon, 2006–2015*, SCI. REP. 6, 21892, at 2 (Feb. 22, 2016). https://doi.org/10.1038/srep21892 (last visited July 31, 2026).

143. Salmon begin life as eggs in these freshwater hatcheries before being moved to specialized facilities that raise the juvenile fish from the egg to the "smolt" stage, during which they adapt to transition from freshwater to saltwater. Facilities that use land-based flow-through systems, where water is added and flushed at regular intervals, allow feces and uneaten fish feed to be released into receiving streams, increasing nitrogen, phosphorus and suspended solids in the waterbeds of receiving streams.[146]

144. Research indicates that areas downstream of salmon hatcheries and smolt farms in Chile damage ecosystems, as only species that can tolerate higher levels of organic matter, nitrogen and phosphorus are able to survive.[147] Land-based salmon farming was recently linked to pollution of the Chesque River, with community members describing some parts of the river as "reddish and slimy."[148]

145. During their egg and smolt phase, salmon are particularly susceptible to infection. This leads to the heavy use of antibiotics such as florfenicol and oxytetracycline.[149] As in marine net pen facilities, excessive use of antibiotics at this phase contributes to the growth of antibiotic-resistant diseases and antibiotic residues can harm wildlife by interfering with the growth of beneficial bacteria.

146. Land-based hatcheries and smolt farms also often use salt to prevent and control parasites. However, if operators do not remove the salt before discharging wastewater into streams, they can increase the salinity of waters downstream of salmon farms, harming river ecosystems.[150]

---

[146] Quiñones, *supra* note 50, at 377–78.

[147] *Id.* at 378.

[148] Basso, *supra* note 96.

[149] Quiñones, *supra* note 50, at 378.

[150] *Id.*

147. Australis Agua Dulce S.A. was recently approved for an expanded production permit,[151] meaning the resulting nutrient pollution will also increase.

148. Even further, the environmental degradation continues even far beyond the salmon production cycle. After salmon net pen sites go fallow, trash and debris from the operations end up in the ocean.[152] As one local diver described, what remains is "rotten mud" on the seabed, with tons of "rubbish" left behind.[153] Indeed, in 2022, Chilean authorities found a beach covered in trash that was identified as originating from Australis net pens.[154]

149. Defendant's supplier Australis also inherently endangers the environment by operating gas-powered boats in and around Chile's sensitive ecological areas. In July 2025, an Australis boat spilled nearly 2,000 gallons of oil into Kawésqar National Reserve during routine net pen maintenance.[155]

---

[151] Subsecretaria De Pesca Y Acuicultura, Agua Dulce Expanded Permit 2643-2025 (Nov. 26, 2025), https://subpesca.ceropapel.cl/validar/?key=21908858&hash=8ab1a (last visited July 27, 2026).

[152] Lucy Meyer & Casey Ann Smith, *Salmon Farms in Patagonia Face Growing Opposition*, N.Y. TIMES (Aug. 13, 2024), https://www.nytimes.com/2024/08/13/science/chile-salmon-farms-patagonia.html (last visited July 27, 2026); *Estado Salmonero*, *supra* note 75, at 4:50.

[153] *Estado Salmonero*, *supra* note 75, at 7:45 - 10:00; *see also* Bazán & Espinoza, *supra* note 55.

[154] *Notifican a salmonicultoras por contaminación de playa en isla Riesco*, FUNDACIÓN TERRAM (Mar. 29, 2022), https://www.terram.cl/notifican-a-salmonicultoras-por-contaminacion-de-playa-en-isla-riesco/ (last visited July 27, 2026).

[155] *Conaf files lawsuit against salmon farm Australis after hydrocarbon spill in Glacier Sound*, FUNDACIÓN TERRAM (Jan. 12, 2026), https://www-terram-cl.translate.goog/conaf-se-querella-contra-salmonera-australis-tras-derrame-de-hidrocarburos-en-seno-glacier/?_x_tr_sl=es&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=wapp (last visited July 27, 2026).

150. Industrial-scale net pen salmon farming poses such a risk to marine environments that several jurisdictions banned the practice, including the State of Washington[156] and the province of British Columbia, where Canada committed to phasing out salmon open net-pen aquaculture by 2029.[157] Other jurisdictions are considering following suit.[158]

151. These negative impacts to the fragile marine ecosystems surrounding the industrial farms where Defendant's Salmon Products are grown contradict Defendant's Deceptive Salmon Product Marketing including the Sustainably Farm-Raised Claim and the expectations of reasonable consumers including Plaintiff and Class Members at every point of the supply chain.

### F. The Production of Defendant's Salmon Products Also Places Salmon Farm Workers in Hazardous and Deadly Conditions

152. In addition to the environmental and animal welfare harms, production of the salmon contained in Defendant's Salmon Products also endangers salmon farm workers, and shamefully, even resulted in death.

153. Indeed, since July 2025, two divers working at Australis farms, the source of where the Salmon Products are grown, have died.

---

[156] Monique Merrill, *Washington state bans commercial finfish net pen farms*, COURTHOUSE NEWS (Jan. 7, 2025), https://www.courthousenews.com/washington-state-bans-commercial-finfish-net-pen-farms/ (last visited July 27, 2026).

[157] Charles Mather, *Phasing out open net-pen salmon farming in British Columbia*, 10 SCI. ADV. Issue 42 (Oct. 16, 2024), https://www.science.org/doi/10.1126/sciadv.adt4568 (last visited July 27, 2026); *Federal Court of Appeal upholds decision to keep salmon farms out of B.C.'s Discovery Islands*, CBC (Jan. 30, 2026), https://www.cbc.ca/news/canada/british-columbia/federal-appeal-over-discovery-island-aquaculture-ban-9.7068583 (last visited July 27, 2026).

[158] Alejandro Figueroa, *Legislators push to prohibit net pen aquaculture in Oregon*, OREGON PUBLIC BROADCASTING (Feb. 26, 2025), https://www.opb.org/article/2025/02/26/legislators-push-to-prohibit-net-pen-aquaculture-in-oregon/ (last visited July 27, 2026).

154. On July 24, 2025, an experienced diver working at an Australis farm was found unconscious by fellow workers and could not be revived by an emergency medical team.[159] Earlier this year on January 8, 2026, another diver employed by a contracting service at an Australis farm died.[160]

155. Australis has not released further details of these deaths, but Chile's salmon industry has come under broad scrutiny for its high rate of accidents and deaths of workers. In fact, according to one recent report, in the last 12 years 83 workers have died in accidents in the sector, including in fish farms, processing plants and transport vessels associated with Chile's salmon industry.[161] A 2022 report found that on average, one worker per month was injured or killed in the industry in the previous year.[162]

---

[159] Juan Carlos Cárdenas N., *Salmones de sangre del fin del mundo: 83 trabajadores muertos en una década de oro para la industria chilena del salmon*, ECOCEANOS (Oct. 20, 2025), https://www.ecoceanos.cl/2025/10/salmones-de-sangre-del-fin-del-mundo-83-trabajadores-muertos-en-una-decada-de-oro-para-la-industria-chilena-del-salmon/ (last visited July 27, 2026); *Buzo murere mientras realizaba faenas en centro de cultivo cercano a Puerto Cisnes*, FUNDACIÓN TERRAM (July 22, 2025), https://www.terram.cl/buzo-muere-mientras-realizaba-faenas-en-centro-de-cultivo-cercano-a-puerto-cisnes/ (last visited July 27, 2026).

[160] Jonathan Garcés, *Another diver dies in an accident at a Chilean salmon farm*, FISHFARMINGEXPERT (Jan. 9, 2026), https://www.fishfarmingexpert.com/australis-seafoods-aysen-province-chile/another-diver-dies-in-an-accident-at-a-chilean-salmon-farm/2050755 (last visited July 27, 2026).

[161] Basso, *supra* note 96; *'Those who eat Chilean salmon cannot imagine how much human blood it carries with it'*, THE GUARDIAN (Dec. 2, 2025), https://www.theguardian.com/global-development/2025/dec/02/chile-salmon-farms-fish-industry (last visited July 27, 2026); Juan Carlos Cárdenas, *supra* note 159.

[162] Cavalli, *supra* note 93.

156. Conditions are especially hazardous for divers who are hired to collect dead animals, repair structures and clean nets.[163] Those divers frequently experience injuries from entrapment in nets.[164]

157. Moreover, one study explained that divers are frequently required to exceed diving safety limits.[165] Exceeding these safety limits can result in death from decompression sickness and chronic disabilities from dysbaric osteonecrosis, also known as "bone rot."[166]

158. These grave safety risks are exacerbated by the overproduction of the salmon suppling Defendant's Salmon Products and the resulting mass fish mortalities and fish escapes, because divers must repeatedly descend far below typical limits to collect fish and repair nets.[167]

159. Endangering the lives of the farm workers at the facilities growing the salmon for the Salmon Products is also inconsistent with Defendant's Sustainably Farm-Raised Claim and Defendant's parent company's supposed "guarantee" of "healthy work environments" and "culture of safety and health at work."[168]

*   *   *

160. In sum, at every step of production of the salmon contained in Defendant's Salmon Products marketed as "Sustainably Farm-Raised"—from the catching of forage fish for salmon

[163] *Id.* Lissandra Souto Cavalli et al., *Salmon mass mortality events and occupational health and safety in Chilean aquaculture*, ALL LIFE, 16:1, 2207772, at 8-9. (2023)

[164] *Id.*

[165] *Id.* at 10. Divers are often required to perform 8 to 10 successive dives (averaging 7 minutes each) to repair cages at 30 meters depth, more than doubling the maximum 24-hour safety limit of 30 minutes at 30 meters.

[166] *Id.* at 9.

[167] *Id.* at 10.

[168] *Sustainability Strategy Australis 2020 / 2030*, *supra* note 33.

feed through the harvesting of mature fish from their net pens—Defendant's salmon supplier does not farm sustainably, and Defendant's salmon is not responsibly sourced.

## IV. Defendant Is Keenly Aware that Its Sustainably Farmed and Responsibly Sourced Claims Are Deceptive and Misleading

161. At all relevant times, Defendant knew or reasonably should have known that the Salmon Products, which they marketed and sold, were in fact not "Sustainably Farm-Raised" as promised.

162. This is because Defendant has exclusive access to knowledge and information regarding the Salmon Product's status as "Sustainably Farm-Raised" and "Responsibly Sourced."

163. Defendant knew that its sole salmon supplier engaged in all the above conduct because there is virtually no daylight between them. Defendant and Australis share a top executive, Andrés Lyon Labbé, who is Australis's CEO/General Manager and Defendant Trapananda's manager and lead contact.[169]

164. Moreover, although there is an ongoing legal dispute between Australis's past and present owners about the alleged misrepresentation of potential salmon production volumes (through overproduction),[170] Australis's overproduction continued well past the ownership change.

[169] Australis Seafoods, *supra* note 46, at 13; *2026 Florida Limited Liability Company Annual Report*, TRAPANANDA SEAFARMS, LLC (Apr. 7, 2026), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=flal-l16000009804-841d2f1b-b2a6-4601-aa5f-3ac2f24d2e9a&transactionId=l16000009804-46b813a1-a6e2-452f-8129-7e7e7478106d&formatType=PDF (last visited July 27, 2026).

[170] Felipe Arancibia Muñoz, *Caso Australis: Joyvio se querella contra ex gerente en trama de sobreproducción de 106 mil toneladas de salmon*, INTERFERENCIA (Apr. 14, 2025), https://interferencia.cl/articulos/caso-australis-joyvio-se-querella-contra-ex-gerente-en-trama-de-sobreproduccion-de-106-mil (last visited July 27, 2026).

This, together with internal corporate documents obtained by journalists, plausibly indicates that Australis's present violations are knowing and likely to continue under current ownership.[171]

165. Indeed, there is evidence from the dispute that Australis's new owner intentionally continued to overproduce after discovering the past overproduction.[172] According to the 2021 corporate presentation referenced above, Australis noted that its "excess production over the last years…is becoming a serious liability."[173]

166. The presentation stated, "Why we haven't solve [sic] it yet?...So far, No political incentive from authorities to fix the problem…we cannot ask environmental evaluation authorities to grant us more capacity without putting them on notice we weren't complying with their regulation."[174] Rather than curb its overproduction, the presentation detailed Australis's plans to increase production each year after 2021[175]—to produce at the same, excessive volume while avoiding penalties.

167. Australis planned to "participate in [government] voluntary supervision program, with sites that we know wont [sic] excess production [sic]…so we can 'take' the heat out of our more complicated sites and re direct [sic] the attention to the less complicated ones."[176] Meanwhile, Australis planned to shift its overproduction to facilities not under government scrutiny.[177]

---

[171] *See e.g. Los correos ocultos*, *supra* note 19; Maximiliano Bazán & Daniel Espinoza, *95 casos de sobreproducción de salmons en reservas nacionales sin sanción—PARTE 2*, CIPER (May 7, 2024), https://www.ciperchile.cl/2024/05/07/95-casos-de-sobreproduccion-de-salmones-en-reservas-nacionales-sin-sancion-parte-2/ (last visited July 27, 2026).

[172] *Id.*

[173] *Australis Seafoods Corporate Presentation*, *supra* note 20, at 11.

[174] *Id.* at 12.

[175] *Id.* at 4.

[176] *Id.* at 13.

[177] *Id.* at 14-16.

168. The presentation stated the "overall effect for" Australis "to comply 100% with" no "excess production, will be to diminish[] our production [] between 25% to 35%."[178] Together with costs that "will be much higher, with lower volume in processing plants, and having to stock less in the same numbers of site, producing less and having to bare [sic] more fixed cost," that was "really something we cannot afford."[179]

169. This is the same corporate presentation in which Australis proposed "captur[ing] extra margin" in the United States by launching a "Super Premium Sustainable" salmon brand—Mama Bear—for retail sale.[180]

170. For these reasons and those stated above, Defendant, through its sole supplier and owner, had exclusive access to and reviewed or should have reasonably reviewed specific records tracking the production and methods used to produce the salmon for the Salmon Products, which it promises consumers through its Deceptive Salmon Product Marketing are "Sustainably Farm-Raised."

171. Defendant had a duty to ensure its marketing with respect to the Salmon Products was not deceptive or misleading and thus, had a duty to review this information and any relevant documents. Consequently, Defendant knew or should have known that its Salmon Products are not "Sustainably Farm-Raised," as it promised for years.

---

[178] *Id.* at 12.

[179] *Id.*

[180] *Id.* at 25-26.

## V. Defendant Lacks the Basic Policies or Oversight Justifying its Prominent Material Deceptive Salmon Marketing

172. Despite its bold promises, Defendant and its sole supplier failed to implement and maintain the appropriate corporate controls for Defendant to lawfully market and sell the Salmon Products with the Deceptive Salmon Product Marketing.

173. Defendant, as the marketer and distributor of the Salmon Products exclusively sourced from owner Australis, should have implemented the necessary policies and procedures to ensure compliance with its own marketing promises.

174. As a result of Defendant's Deceptive Salmon Product Marketing, reasonable consumers including Plaintiff and the members of the Class expected that Defendant would have the proper company-wide practices in place to comply with the specific and material promises Defendant made to consumers regarding the whether the Salmon Products are "Sustainably Farm-Raised" as promised regardless of whether any particular salmon contained in the Salmon Product bought by Plaintiff specifically came from the salmon farms referenced herein.

175. However, as described herein, Defendant failed to implement, maintain and/or enforce proper policies and procedures with regard to oversight of its suppliers and the farms where its Salmon Products are grown resulting in devastating harms to marine ecosystems contrary to Defendant's Deceptive Salmon Product Marketing.

176. In summary, for the reasons stated herein, Defendant represents through its Deceptive Salmon Product Marketing that its Salmon Products are "Sustainably Farm-Raised," and that Defendant has the proper policies and procedures in place through its sole supplier to ensure compliance with its marketing promises. However, as detailed herein, Defendant failed to make good on its promises as its Salmon Products are in no way sustainable. Instead, the Salmon Products result from chronic overproduction in legally protected national reserves leading to

nutrient pollution and oxygen-free dead zones and mass fish die-offs, the heavy use of antibiotics and toxic chemicals, the killing and injuring of endangered wildlife, crowding of the farmed fish and salmon-feed sourcing linked to overfishing.

177. No reasonable consumer would deem the Salmon Products "Sustainably Farm-Raised" if they knew Defendant and its sole supplier failed to implement appropriate policies and standards to ensure that its Salmon Products are "Sustainably Farm-Raised" and thus, do not negatively impact marine ecosystems and the environment. Consequently, Plaintiff and Class Members who paid a premium for the Salmon Products due to Defendant's Deceptive Salmon Product Marketing and were damaged as a result.

**FED. R. CIV. P. 9(b) ALLEGATIONS**
***(Affirmative and By Omission)***

178. Although Defendant is in the best position to know what content it placed in its marketing materials and the Salmon Product packaging during the relevant timeframe and the knowledge regarding the Salmon Product's true nature and devastating impact on marine ecosystems and the environment and Defendant's failure to disclose it, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

179. **WHO**: Through its Mama Bear brand, Defendant deceptively and misleadingly misrepresents the Salmon Products while omitting material information from its Deceptive Salmon Product Marketing regarding their true nature. Defendant is the Miami-based vertically integrated U.S. commercial arm and sole North American distributor of Chilean salmon producer Australis Seafoods S.A.

180. **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it misrepresented the Salmon Products while omitting and concealing they are not in fact "Sustainably Farm-Raised" as promised. Through its Deceptive Salmon Product Marketing and

its Mama Bear brand, Defendant represented that its Salmon Products are "Sustainably Farm-Raised" directly on the front label of the packaging, and reinforces that representation by claiming on the back of the packaging that its Salmon Products are "responsibly sourced," as well as with supporting representations in its online advertising, that the Salmon Products are "sustainably sourced," the "most sustainable protein," and the "most . . . sustainable salmon." Defendant also failed to disclose the material fact that the Salmon Products are unsustainably farmed and irresponsibly sourced, as detailed herein.

181. **WHEN**: Defendant began using the challenged claims on the Salmon Products' packaging during the class period prior to and at the point of sale and has continued to do so through the present. Plaintiff purchased the Salmon Products in reliance on these representations during the Class Period.

182. **WHERE**: On the front of the Salmon Products' packaging where it cannot be missed by reasonable consumers sold in retail stores throughout Illinois and the United States, including stores in Illinois where Plaintiff purchased the Salmon Products, and on the back of the package and in Defendant's online advertising and social media, including its Mama Bear Instagram account and Australis-seafoods.com.

183. **HOW**: Defendant made material affirmative representations and omissions of fact regarding the true nature of the Salmon Products and their "Sustainably Farm-Raised" quality, in written and electronic form including the Sustainably Farm-Raised Claim made directly on the Salmon Product's packaging and in online advertising. Defendant's Deceptive Salmon Product Marketing including its representations was deceptive and misleading, and the omissions material, because the Salmon Products are made from industrially net pen-farmed Atlantic salmon supplied by Defendant's parent, Australis, and produced through practices that are neither sustainable nor

responsible—including chronic overproduction in legally protected national reserves, nutrient pollution and oxygen-free dead zones, mass fish die-offs, the heavy use of antibiotics and toxic chemicals, the killing and injuring of endangered wildlife, crowding of the farmed fish and salmon-feed sourcing linked to overfishing.

184. **WHY**: Defendant engaged in its Deceptive Salmon Product Marketing including its representations and omissions to induce sustainability-conscious consumers, including Plaintiff and Class Members, to purchase the Salmon Products and to pay a premium for them, thereby "captur[ing] extra margin," consistent with Australis's internal strategy to launch Mama Bear as a "Super Premium Sustainable" salmon brand in the United States.

185. **INJURY**: Plaintiff and Class Members purchased, or paid more for, the Salmon Products in reasonable reliance on Defendant's Deceptive Salmon Product Marketing and paid a price premium they would not otherwise have paid. Had they known the truth, they would not have purchased the Salmon Products or would have paid less for them. Consumers continue to suffer economic harm because the Salmon Products are still sold with Defendant's deceptive and misleading representations and material omissions in its Deceptive Salmon Product Marketing throughout the United States including the State of Illinois.

## CLASS DEFINITIONS AND ALLEGATIONS

186. Plaintiff seeks redress in her individual capacity and on behalf of a Class consisting of similarly situated consumers for the following Classes.

187. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) on behalf of herself and all others similarly situated as members. The "**Nationwide Class**" is defined as:

> All persons who purchased in the United States any of the Salmon Products for personal/household use within the applicable statute of limitations, until the date notice is disseminated.

188. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) individually and on behalf of the following "**Multi-State Consumer Protection Class:**"

> All persons who purchased in the State of Illinois or any state with similar laws[181] any of the Salmon Products for personal/household use within the applicable statute of limitations, until the date notice is disseminated.

189. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) individually and on behalf of the following "**Illinois Class:**"

> All persons who purchased in the State of Illinois any of the Salmon Products for personal/household use within the applicable statute of limitations, until the date notice is disseminated.

190. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or subclass divisions after discovery.

191. Excluded from the Classes are: (i) any judge presiding over this action and their family members; (ii) Defendant, its subsidiaries, successors, or any entity in which Defendant or its parent company, have a controlling interest, Defendant's current or former employees, officers,

[181] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code §§ 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.). *See Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *9-10 (N.D. Ill. Nov. 16, 2021) (certifying a similar multi-state consumer protection class).

or directors; (iii) persons that properly exclude themselves from the Class; (iv) the legal representatives, successors, or assignees of any properly excluded persons; and (v) Class Counsel.

192. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality and adequacy because:

193. **Numerosity**: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are at least thousands of consumers who are Class Members that have been damaged by Defendant's deceptive and misleading practices.

194. **Commonality**: The questions of law and fact common to the Class Members, which predominate over any questions that may affect individual Class Members include, but are not limited to:

a) Whether Defendant is responsible for the conduct alleged herein, which was uniformly directed at all reasonable consumers who purchased the Salmon Products;

b) Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent or unlawful business practices with respect to the advertising, marketing and sale of their Salmon Products;

c) Whether Defendant's representations and omissions in its Deceptive Salmon Product Marketing were misleading or deceptive;

d) Whether Defendant omitted or failed to disclose material information to Plaintiff and Class Members regarding the Salmon Products;

e) Whether Defendant's Deceptive Salmon Product Marketing concerning its Salmon Products was likely to deceive the public;

f) Whether Defendant's conduct violates public policy;

g) Whether Plaintiff and Class Members suffered an ascertainable loss of monies or property or other value as a result of Defendant's acts and omissions of material facts;

h) Whether Defendant was unjustly enriched at the expense of Plaintiff and Class Members in connection with selling the Salmon Products;

i) Whether Plaintiff and Class Members are entitled to monetary damages and, if so, the nature of such relief; and

j) Whether Plaintiff and Class Members are entitled to injunctive, declaratory, or other equitable relief including attorneys' fees and costs.

195. **Typicality**: Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was exposed and susceptible to the same deceptive, misleading conduct including Defendant's practices and policies surrounding its uniform Deceptive Salmon Product Marketing and purchased Defendant's Salmon Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

196. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class Members because her interests do not conflict with the interests of the Class Members she seeks to represent; her consumer protection claims are common to all members of the Class and she has a strong interest in vindicating their rights; she retained counsel that is competent and experienced in complex class action litigation and she intends to vigorously prosecute this action.

197. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a) The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome and a waste of judicial and/or litigation resources;

b) The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome and expensive—if not totally impossible—to justify individual actions;

c) When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it

were attempted through filing, discovery and trial of all individual cases;

d) This class action will promote orderly, efficient, expeditious and appropriate adjudication and administration of Class claims;

e) Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f) This class action will assure uniformity of decisions among Class Members;

g) The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h) Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

i) It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendant's uniform false marketing and advertising to purchase their Salmon Products as being sustainable.

198. Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

199. **Injunctive and Declaratory Relief**. Defendant's practices are uniform as to all Class Members. Defendant acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole. Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists. Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past

harm). Further, injunctive relief, in the form of removing Defendant's Deceptive Salmon Product Marketing including its Sustainably Farm-Raised Claim is necessary to dispel the public misperception about the Salmon Products that resulted from years of Defendant's unfair, fraudulent and unlawful marketing efforts. An injunction requiring removal of the claim will prevent the ongoing deception and repeat purchases based thereon. It is also not available through a legal remedy (such as monetary damages). In addition, injunctive relief is necessary because discovery and Plaintiff's investigation are not yet complete. Moreover, because the Court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective purchasing practices, prices of past/future Salmon Product sales and quantities of past/future Salmon Product sales.

## CLAIMS FOR RELIEF

### COUNT ONE
### NEGLIGENT MISREPRESENTATION
***(On Behalf of Plaintiff and the Nationwide Class and, in the alternative, the Illinois Class)***

200. Plaintiff, individually, and on behalf of the Nationwide Class and, in the alternative, the Illinois Class, hereby realleges paragraphs 1 through 199 as if fully set forth herein.

201. In the course of its business and through Defendant's Deceptive Salmon Product Marketing including the Sustainably Farm-Raised Claim on the front of the Salmon Products' packaging as well as corroborating representations on the back of the packaging and throughout Defendant's online advertising, Defendant supplied deceptive and misleading information to Plaintiff and Class Members, as set forth above, because the Salmon Products are unsustainably farmed, causing negative impacts to marine ecosystems and the environment.

202. Defendant had a duty to Plaintiff and Class Members to exercise reasonable care in making its Deceptive Salmon Product marketing including the Sustainably Farm-Raised Claim

about the Salmon Products. Sustainability is a "credence" attribute that consumers cannot verify at or after the point of sale, and consumers must therefore rely on the seller to communicate it truthfully.

203. Defendant breached that duty by failing to exercise reasonable care or competence in obtaining and communicating information about the Salmon Products, and by making the representation without a reasonable basis for believing it to be true, when Defendant knew or should have known—including through its shared executive leadership with, and control by, its sole salmon supplier Australis, and through its exclusive information and knowledge including internal corporate documents—that the Salmon Products are not sustainably farm-raised.

204. Defendant intended and reasonably expected that Plaintiff and Class Members would rely on this representation in deciding whether to purchase the Salmon Products.

205. Plaintiff and Class Members viewed Defendant's Deceptive Salmon Product Marketing and consequently, believed that the Salmon Products were Sustainably Farm-Raised meaning their production did not cause negative impacts to marine ecosystems and the environment.

206. Plaintiff and Class Members justifiably and reasonably relied on Defendant's Deceptive Salmon Product Marketing in purchasing the Salmon Products and paying a premium for them.

207. As a direct and proximate result of Defendant's negligent misrepresentation, Plaintiff and Class Members were injured and suffered damages, including the purchase price or premium they paid for the Salmon Products, and are entitled to recover those damages and such other relief as may be proven at trial.

## COUNT TWO
## FRAUD
***(On Behalf of Plaintiff and the Nationwide Class and, in the alternative, the Illinois Class)***

208. Plaintiff, individually, and on behalf of the Nationwide Class and, in the alternative, the Illinois Class, hereby realleges paragraphs 1 through 199 as if fully set forth herein.

209. As alleged above, Defendant made false and misleading representations that the Salmon Products are "Sustainably Farm-Raised" and failed to disclose material facts about the Salmon Products—namely, that they are unsustainably farmed through polluting and ecosystem-destructive production methods.

210. Defendant's misrepresentation and omissions were material. A reasonable consumer would attach importance to whether the Salmon Products are "Sustainably Farm-Raised" in deciding whether to purchase them and how much to pay.

211. Defendant knew that its representation was false and that the omitted facts were material, or made the representation recklessly and without knowledge of its truth, given, among other things, its shared executive with and control by Australis and exclusive information and knowledge including the internal corporate documents described above.

212. Defendant made the misrepresentation and omissions with the intent that Plaintiff and Class Members rely on them and purchase the Salmon Products.

213. Plaintiff and Class Members viewed and reasonably and justifiably relied on Defendant's Deceptive Salmon Product Marketing including its "Sustainably Farm-Raised" Claim in purchasing the Salmon Products and paying a premium for them.

214. As a direct and proximate result of Defendant's fraud, Plaintiff and Class Members were injured and suffered damages, including the purchase price or premium they paid for the

Salmon Products. Defendant's conduct was willful, wanton and in reckless disregard of the truth, entitling Plaintiff and Class Members to an award of punitive damages.

## COUNT THREE
## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
**Violation of 815 ILCS 505/1, *et seq.***
***(On Behalf of Plaintiff and the Illinois Class)***

215. Plaintiff, individually, and on behalf of the Illinois Class, hereby realleges paragraphs 1 through 199 as if fully set forth herein.

216. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." The ICFA is to be liberally construed to effectuate its purpose.

217. Defendant does business in Illinois and sells and distributes the Salmon Products in Illinois, and engaged in deceptive and unfair acts and practices in connection with the sale of the Salmon Products in Illinois and elsewhere in the United States.

218. The Salmon Products are "merchandise" and Plaintiff and the Illinois Class Members are "consumers" within the meaning of the ICFA.

219. Defendant engaged in unfair and deceptive acts and practices in violation of 815 ILCS 505/2 by representing that the Salmon Products are "Sustainably Farm-Raised" through its Deceptive Salmon Product Marketing when, in reality, they are not, and by concealing, suppressing and omitting the material fact that the Salmon Products are unsustainably farmed.

220. Defendant knew or should have known that its Deceptive Salmon Product Marketing was false and misleading, and that by omitting and failing to disclose the truth, it omitted material facts that would alter a reasonable consumer's decision to purchase the Salmon Products.

221. Defendant's deceptive and unfair acts occurred in the course of conduct involving trade and commerce in Illinois and throughout the United States.

222. Defendant intended that Plaintiff and the Illinois Class Members rely on its deceptive acts and omissions when purchasing the Salmon Products.

223. Defendant's deceptive and unfair acts proximately caused actual injury and damage to Plaintiff and the Illinois Class Members at the time of purchase. Plaintiff and the Illinois Class Members would not have purchased the Salmon Products, or would have paid less for them, but for Defendant's material misrepresentations and omissions.

224. Defendant's conduct showed malice, motive and reckless disregard of the truth such that an award of punitive damages is appropriate. Pursuant to 815 ILCS 505/10a, Plaintiff and the Illinois Class Members are entitled to recover actual damages, punitive damages, injunctive relief and reasonable attorneys' fees and costs.

## COUNT FOUR
## ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
## Violation of 815 ILCS 510/2, *et seq.*
## *(On Behalf of Plaintiff and the Illinois Class)*

225. Plaintiff, individually, and on behalf of the Illinois Class, hereby realleges paragraphs 1 through 199 as if fully set forth herein

226. The Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, et seq., prohibits unfair and deceptive trade practices. Section 510/2 provides, in pertinent part, that a person engages in a deceptive trade practice when, in the course of his or her business,

vocation, or occupation, the person, among other things: "(5) represents that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(7) represents that goods or services are of a particular standard, quality, or grade . . . if they are of another"; or "(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

227. Defendant engaged in deceptive trade practices in violation of 815 ILCS 510/2 by representing, through its "Sustainably Farm-Raised" claim, that the Salmon Products have characteristics, uses and benefits they do not have and are of a standard, quality, or grade they are not, and by concealing, suppressing and omitting the material fact that the Salmon Products are unsustainably farmed.

228. Defendant's deceptive trade practices created a likelihood of confusion or of misunderstanding among reasonable consumers, including Plaintiff and the Illinois Class Members.

229. Defendant knew or should have known that its "Sustainably Farm-Raised" representation was false and misleading.

230. Defendant's deceptive acts occurred in the course of its business and involved trade and commerce in Illinois and throughout the United States.

231. Unless enjoined, Defendant will continue to engage in the deceptive trade practices alleged herein. Plaintiff and the Illinois Class Members are likely to be damaged by Defendant's continued conduct because they would purchase the Salmon Products again in the future if Defendant's representations were made truthful, but cannot rely on those representations so long as they remain deceptive. Plaintiff and the Illinois Class Members therefore lack an adequate

remedy at law and, pursuant to 815 ILCS 510/3, are entitled to injunctive relief and, as the prevailing party, to an award of reasonable attorneys' fees and costs.

**COUNT FIVE**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
***(On Behalf of Plaintiff and the Multi-State Consumer Protection Class)***

232. Plaintiff, individually, and on behalf of the Multi-State Consumer Protection Class, hereby realleges paragraphs 1 through 199 as if fully set forth herein.

233. Plaintiff and Multi-State Consumer Protection Class Members have been injured as a result of Defendant's violations of the state consumer protection statutes referenced in the class definition above, which provide a basis for redress to Plaintiff and Multi-State Consumer Protection Class Members based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

234. As alleged more fully above, Defendant, through its Deceptive Salmon Product Marketing, deceptively and misleadingly represented to Plaintiff and members of the Classes that the Salmon Products are "Sustainably Farm-Raised" when they are not.

235. This uniform and pervasive representation was made through Defendant's Deceptive Salmon Product Marketing campaign, including on the Salmon Products' packaging materials, the websites of Defendant, and other promotional materials.

236. As described herein, prior to and after distributing the Salmon Products into the consumer marketplace, Defendant knew that the Salmon Products were not as advertised. Specifically, Defendant knew that it sold and sells Salmon Products not "Sustainably Farm-Raised" as promised because their production negatively impacts marine ecosystems and the environment. However, Defendant omitted this material information from consumers in its marketing of the Salmon Product. Nonetheless, Defendant, through its Deceptive Salmon Product

Marketing detailed herein, continued to sell the Salmon Products in the United States in order to increase its own profits, and garner market share.

237. Defendant's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Classes.

238. Defendant violated the Multi-State Consumer Protection Classes states' unfair and deceptive acts and practices laws by misrepresenting, omitting, concealing and failing to disclose material facts regarding the Salmon Product including that it sold and sells Salmon Products not "Sustainably Farm-Raised" as promised.

239. Defendant's misrepresentations and omissions were material to Plaintiff's and members of the Classes' decision to purchase the Salmon Products or pay a premium for them.

240. Defendant made its untrue and/or deceptive and misleading statements and representations willfully, wantonly and with reckless disregard for the truth.

241. As a result of Defendant's Deceptive Salmon Product Marketing and violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and members of the Classes paid a premium for the Salmon Products.

242. Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and members of the Classes are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT SIX
## UNJUST ENRICHMENT/QUASI-CONTRACT
***(On Behalf of Plaintiff and the Nationwide Class and, in the alternative, the Illinois Class)***

243. Plaintiff, individually, and on behalf of the Nationwide Class and, in the alternative, the Illinois Class, hereby realleges paragraphs 1 through 199 as if fully set forth herein.

244. Plaintiff and Class Members conferred a benefit on Defendant by purchasing the Salmon Products, for which Defendant received and retained substantial revenues and profits.

245. Defendant obtained this benefit through its unfair and unlawful conduct as well as by its deception including its misrepresentations and omissions in its Deceptive Salmon Product Marketing, as set forth above. Defendant's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm.

246. Plaintiff and Class Members were harmed at the time of purchase and paid a premium for the Salmon Products, which are not as Defendant represented them to be. While Plaintiff and Class Members were harmed, Defendant was unjustly enriched by its unfair and unlawful conduct as well as by its deception including its misrepresentations and omissions in its Deceptive Salmon Product Marketing.

247. Defendant's conduct allows Defendant to knowingly realize substantial revenues from selling the Salmon Products at the expense of, and to the detriment of, Plaintiff and Class Members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental principles of justice, equity and good conscience.

248. Under common-law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class Members' overpayments. Plaintiff and Class Members seek disgorgement of all profits resulting from such

overpayments and the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the proposed Classes, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A. Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B. Declaring Defendant's conduct violates the statutes referenced herein;

C. Ordering payment of actual and punitive damages, restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class Members as a result of Defendant's unlawful, unfair and fraudulent business practices;

D. Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

E. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and members of the Classes;

F. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G. Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

DATED: August 27, 2026

By: /s/ *Melissa S. Weiner*

Melissa S. Weiner (MN Bar No. 0387900)
Ryan T. Gott (MN Bar No. 0397978)
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, Minnesota 55391

Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pwfirm.com
Email: rgott@pwfirm.com

Daniel Tomascik
**Jennings & Earley PLLC**
500 President Clinton Avenue
Suite 110 Little Rock, AR 72201
Telephone: (501) 255-8569
Email: dan@jefirm.com

Kelsey R. Eberly* (CA Bar No. 301025)
Samantha Garfinkle* (DC Bar No. 90045920)
**FarmSTAND**
712 H Street NE Suite 2534
Washington, DC 20002
Telephone: (202) 595-8816
Email: kelsey@farmstand.org
Email: samantha@farmstand.org

*Attorneys for Plaintiff and the Proposed Class*

**Pro Hac Vice Forthcoming*